**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

ALBERT CLATTERBUCK,
CHRISTOPHER MARTIN,
EARL MCCRAW,
JOHN JORDAN, AND
MICHAEL SLOAN,

      *Plaintiffs*,

v.                   Case No.: **3:11CV00043**

CITY OF CHARLOTTESVILLE,

      *Defendant*.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

  Comes now the City of Charlottesville, by counsel, and in support of its Motion for Summary Judgment, submits the following exhibits and states as follows in support thereof:

### INTRODUCTION

  In their Complaint, Albert Clatterbuck ("Clatterbuck"), Christopher Martin ("Martin"), Earl McCraw ("McCraw"), John Jordan ("Jordan"), and Michael Sloan ("Sloan") challenged subsections amended and adopted by the Charlottesville City Council August 16, 2010 to §28-31 of the Charlottesville City Code; to-wit §28-31(a)(5)(6) & (9). **Exhibit 1**. Since the case was remanded by the Fourth Circuit Court of Appeals in *Clatterbuck v. City of Charlottesville*, 708 F.3d 549 (4th Cir. 2013), the parties have engaged in written discovery and taken multiple depositions, including those of Plaintiffs Clatterbuck and Martin. Plaintiffs McCraw, Jordan, and Sloan failed to respond to discovery propounded to them by Defendant. This Court granted Defendant's Motion to Dismiss for failure to prosecute their claims by Order entered September 12, 2013 (Doc #55) and dismissed the identical First Amendment claims of McCraw, Jordan, and Sloan with prejudice.

  On July 17, 2013, Defendant took the depositions of the sole remaining plaintiffs, Clatterbuck and Martin. Both testified, without contradiction, that the only subsection they are now challenging in this action is §28-31(a)(9) of the Charlottesville City Code. (A. Clatterbuck Dep. 14:19-25; 15:23) (Relevant portions of Albert Clatterbuck's deposition cited within this brief are attached as **Exhibit 6**); C. Martin Dep. 22:16-25 (Relevant portions of Christopher Martin's deposition cited within this brief are attached as **Exhibit 7**). Accordingly, Defendant will address

its Motion for Summary Judgment brief to the remaining plaintiffs' First Amendment challenge to subsection §28-31(a)(9) which restricts soliciting, as defined by the ordinance, to areas within fifty feet (50') (either side) of two (2) designated vehicle crossovers on the pedestrian Downtown Mall in the City of Charlottesville when those streets are open to vehicular traffic.[1]

## RULE 56, F.R.C.P. STANDARD OF ANALYSIS

Rule 56, F.R.C.P., mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial". *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). At the summary judgment stage, the Court must view the facts in the light most favorable to the non-moving party. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). Summary judgment is appropriate only when the movant shows that there is no genuine dispute as to any material fact … F.R.C.P. 56. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the moving party "need not produce evidence, but simply can argue that there is an absence of evidence by which the non-movant can prove his case". *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994). Additionally, under *Anderson*, the existence of a scintilla of evidence or unsubstantiated conclusory allegations are insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 248-252. The Court must determine whether the record, as a whole, could lead to a reasonable trier of fact to find for the non-movant. *First Hand Commus, LLC v. Schwalbach*, 2006 U.S. Dist. LEXIS 87844 (E.D. Va. 2006).

## FRAMEWORK OF ANALYSIS OF FIRST AMENDMENT
## CHALLENGE TO SUBSECTION 28-31(a)(9)

In *Clatterbuck v. Charlottesville*, 708 F.3d 549 (4th Cir. 2013), the Fourth Circuit remanded this case for development of the record beyond the facial allegations in ¶16 of the Complaint that §28-31(a)(9) was not content neutral based on Plaintiffs allegation in ¶16 of the Complaint that the

---

[1] Subsections 28-31(a)(5) & (a)(6) are also constitutional as reasonable content neutral time, place, and manner restrictions that are narrowly tailored to serve a significant government interest (the right to be left alone and public safety) and leave open ample alternative channels of communication (See Exhibits 1 – 12 to this brief including Exhibit 4 (July 7, 2010 Memo) and Exhibit 5 (August 2, 2010 City Council Agenda).

2

time, place, and manner restriction on speech adopted by the Charlottesville City Council was enacted with censorial intent. The Court found that the Plaintiffs, in their Complaint, had "nudged their claim" across the line from conceivable to plausible by specifically alleging that the City of Charlottesville enacted the ordinance with the intent to reduce the presence of impoverished persons on the Downtown Mall. Defendant submits that the evidence elicited through discovery belies Plaintiffs' claim of censorial intent and establishes that §28-31(a)(9) is a reasonable content neutral time, place, and manner restriction narrowly tailored to serve a significant government interest (public/traffic safety) and leaves open ample areas of communication. Therefore, the City of Charlottesville submits that subsection 28-31(a)(9) is subject to intermediate scrutiny rather than strict scrutiny.[2]

In *Clatterbuck*, the Fourth Circuit found that the Downtown Mall is a traditional public forum and that begging on the Downtown Mall is entitled to the protection of the First Amendment. In *Clatterbuck*, the Fourth Circuit further noted that because Plaintiffs "seek to engage in protected speech in a traditional public forum, the government's power to regulate that speech is limited, though not foreclosed. The government may impose reasonable content-neutral time, place, and manner restrictions that are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Clatterbuck* at 555. The Fourth Circuit then concluded that subsection 28-31(a)(9), viewed formalistically, is not content-neutral because under the ordinance's definition of solicit, there is a distinction based on content with only requests for immediate donations restricted. *Clatterbuck* at 556. However, in *Clatterbuck*, the Fourth Circuit reaffirmed its position, citing *Wag More Dogs v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012) and *Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013) and held that in evaluating content neutrality, it utilizes a pragmatic practical approach rather than a formulistic approach. In *Clatterbuck*, the Fourth Circuit instructed that, "Under this practical analysis, not every content distinction merits strict scrutiny; instead, a distinction is only content-based if it distinguishes content 'with a censorial intent to value some forms of speech over others to distort public debate, to restrict expression because of its message, its ideas, its subject matter, or to prohibit the expression of an

---

[2] The City of Charlottesville submits further that even if the subsection were found not content neutral, the subsection, nonetheless, serves a compelling government interest by the least restrictive means available and is constitutional.

idea simply because society finds the idea itself offensive or disagreeable'". *Clatterbuck* at 556. In deciphering censorial intent, the Fourth Circuit, in *Clatterbuck*, noted that in *Brown* it looked to, as this Court must, to the "relationship – or lack thereof – between the content distinction and the legislative end". *Clatterbuck* at 556.

In *Brown*, the Fourth Circuit affirmed the practical inquiry it propounded in *Wag More Dogs v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012) and reiterated its operative test for content neutrality, again holding that:

> "A regulation is not content-based regulation of speech if (1) the regulation is not a regulation of speech, but a regulation of the places where some speech may occur; (2) the regulation was not adopted because of disagreement with the message the speech conveys; or (3) the government's interests in the regulation are unrelated to the content of the affected speech." *Brown* at 302.

Under *Brown*, the content neutrality inquiry, with respect to §28-31(a)(9)'s limitation to immediate donations, is whether there is "**a** reasonable, **not optimal**, relationship to the asserted interests". *Brown* at 304 (Emphasis supplied). In *Brown*, the Fourth Circuit further noted that it could not determine, with any degree of exactitude, the precise restriction necessary to carry out the sign ordinance's legitimate objectives in that case and stated that, "In practice, the legislature is better equipped to make such empirical judgments[.]" citing *Randall v. Sorrell*, 548 U.S. 230, 248 (2006). *Brown* at 304.

In *Clatterbuck*, although the Fourth Circuit determined that the allegations in ¶16 of the Complaint plausibly alleged that the City enacted the ordinance with a censorial purpose, the Court went on to note that even though no evidence was properly before it at that point to indicate the City's reason or reasons for enacting the ordinance, that the City had "advanced some plausible arguments that it enacted the ordinance without any censorial purpose and with a compelling, content-neutral justification". *Clatterbuck* at 559. The Fourth Circuit found, with respect to the City's arguments, that, "These rationales additionally find support in First Amendment jurisprudence". See *e.g. United States v. Kokinda*, 497 U.S. 720, 733-734 (1990) ("Solicitation impedes the normal flow of traffic. Solicitation requires action by those who would respond: the individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check or produce a credit card.") (internal citations omitted.)

4

*Gresham*, 225 F.3d at 906 ("The City has a legitimate interest in promoting the safety and convenience of its citizens on public streets.)" *Clatterbuck* at 558-559. (See also *Brown* at 305, holding that it was beyond dispute that stated interests in promoting traffic safety were substantial in that case. *Arlington County Repub. Comm. v. Arlington County VA*, 783 F.2d 589, 597 (4th Cir. 1993). The depositions and exhibits produced in discovery and cited in this brief establish the content neutrality arguments advanced by the City.

The City of Charlottesville submits that as a result of the depositions and other discovery in this case included in this brief, the City's purpose for enacting the amendment to the ordinance is no longer mere conjecture. The traffic/public safety purpose proffered and proved by the City supports content neutrality. The record now establishes that the request for immediate donations by panhandlers at the two vehicular crossovers implicated safety concerns based on the observations, among others, of a Charlottesville Police officer, Sgt. Dwayne Jones, and the Director of Neighborhood Services for the City of Charlottesville, James E. Tolbert.

In *Brown*, the Fourth Circuit, as applicable to this case with regard to content neutrality, concluded by stating that, "The content neutrality doctrine of the First Amendment does not impose an all-or-nothing ultimatum upon municipalities that confront these problems. What it requires is that any content distinction a government makes must have a reasonable relation to a content neutral purpose." *Brown* at 306. Defendant submits that following discovery, the record now demonstrates a reasonable relationship between the content definition of solicit " to request an immediate donation" and the content-neutral purpose of traffic/public safety.

<u>THE CHARLOTTESVILLE CITY COUNCIL IN ENACTING SUBSECTION 28-31(a)(9) ON AUGUST 16, 2010, ACTED WITHOUT CENSORIAL INTENT.</u>

Both plaintiffs, at their depositions, admitted that neither is aware of any evidence supporting their allegations contained in ¶16 of the Complaint that the City adopted the subsection "in order to restrict the right of the impoverished to solicit funds for their own well being". Additionally, other evidence in the record belies Plaintiffs' claim in ¶16 of the Complaint, including the City of Charlottesville's assistance to the homeless and impoverished by permitting and providing funding to The Haven, located only four hundred feet (400') off the Downtown Mall and providing housing at The Crossings, only a couple blocks off the Downtown Mall. Indeed, Albert Clatterbuck resides at The Crossing, and Christopher Martin formerly resided there.

1. Plaintiff Clatterbuck testified at his 7/17/13 deposition when asked whether he claimed that the City had a censorial purpose in enacting the vehicular crossover subsection that he didn't know why they enacted it and was not aware of any documents that would support the censorial intent allegation. (A. Clatterbuck Dep. 58:12-25; 59:1-6) Moreover, he testified that he was not aware of any evidence that would show that the City did not have public safety concerns with the vehicular crossovers and traffic danger to pedestrians. (A. Clatterbuck Dep. 59:7-11) He confirmed that he lives at The Crossings (A. Clatterbuck Dep. 56-57) and that he goes to The Haven near the 2nd Street crossing. (A. Clatterbuck Dep. 56:17-24) He also acknowledged that prior to the enactment of §28-31(a)(9) when he panhandled in the 50' area near Five Guys, adjacent to the 4th Street East crossover, that pedestrians would move away from him (as well as everywhere) while cars were coming across the Mall and that it didn't matter where you were sitting. (A. Clatterbuck Dep. 33:3-12)

2. Plaintiff Martin similarly testified at his deposition on 7/17/13, when shown ¶16 of his Complaint alleging censorial intent, that he was not aware of the Charlottesville City Council's purpose in enacting the subsection on August 16, 2010. (C. Martin Dep. 21:25; 22:1-13) He also confirmed that he had resided at The Crossings and, on occasion, would go to The Haven. (C. Martin Dep. 38:21-25; 39:1-9)

3. James E. Tolbert, the Director of Neighborhood Services for the City of Charlottesville, testified at his deposition on 6/27/13 that the City of Charlottesville had acted to help the homeless near the pedestrian Downtown Mall. He confirmed that the City had approved the zoning which had allowed The Haven to locate near the Downtown Mall and has contributed funding to it in order to provide service to the homeless. (J. Tolbert Dep. 91:4-25; 92:1-19) (Relevant portions of James E. Tolbert's deposition transcript cited within this brief are attached as **Exhibit 8.**)

4. Charlottesville City Manager Maurice Jones testified at his deposition on 8/15/13 that the City took affirmative steps to actually locate homeless people close to the Downtown Mall by purchasing property at 4th and Preston, which became The Crossing located "a couple blocks from the Mall". Thirty (30) of the sixty (60) units in The Crossings, he testified, are reserved for individuals transitioning out of homelessness. (M. Jones Dep. 77:1-25; 78:1-

25; & 79:1-7) Relevant portions of Maurice Jones' deposition transcript cited within this brief are attached as **Exhibit 9.**) The City Manager further testified that the City's purpose in enacting the amendment at issue to the ordinance was not to prevent the impoverished from earning a living and that the sole purpose for its enactment was public safety. (M. Jones Dep. 85:22-25; 86:1-2) He also confirmed that prior to the enactment of §28-31(a)(9), the City had approved the location of the First Amendment Wall on the Downtown Mall right outside of City Hall. (M. Jones Dep. 79:3-25)

5. Directional arrows and distances to both The Haven and The Crossing are depicted on the map prepared by James Tolbert of the Downtown Mall. (**Exhibit 2** James E. Tolbert Affidavit with Mall map to scale attached thereto as Exhibit A)

## THE CHARLOTTESVILLE CITY COUNCIL ENACTED SUBSECTION 28-31(a)(9) WITH A SIGNIFICANT AND, INDEED, COMPELLING JUSTIFICATION OF IMPROVING SAFETY AT THE TWO (2) VEHICULAR CROSSOVERS WHEN THEY ARE OPEN FOR VEHICULAR TRAFFIC.

The following deposition testimony and exhibits demonstrate the City's compelling public/traffic safety intent in enacting §28-31(a)(9) on August 16, 2010. The significant public/traffic safety interest restriction necessitated by requests for immediate donations of money from solicitors, as defined in the ordinance, is supported by the personal observations of Charlottesville Police Department Sgt. Dwayne Jones and James E. Tolbert who reported the observations to the City Council.

1. Maurice Jones was the Acting City Manager at the time of the enactment of subsection 28-31(a)(9) of the City of Charlottesville Code on August 16, 2010. Since December, 2010, he has been the City Manager. Mr. Jones testified at his deposition on August 15, 2013 that when he became Acting City Manager, he asked James Tolbert, Director of Neighborhood Services, to research changes to the panhandling section of the Charlottesville Code and provide recommendations for moving forward. (M. Jones Dep. 23:17-22) When members of the community noted concerns over soliciting or panhandling, he made it clear that if changes were going to be made, that they only would be made to address public safety concerns and would need to protect the constitutional rights of individuals to free speech.

(M. Jones Dep. 20:22-25; 21:1-9) Prior to the enactment of the subsection, Mr. Jones testified that he had spoken with Officer Dwayne Jones concerning his concerns about public safety on the Mall and learned from Officer Jones' about incidents at the croosovers involving near misses. (M. Jones Dep. 34:1-25; 35:1-5) He confirmed that he received the July 7, 2010 memorandum (**Exhibit 4**) he had requested from James E. Tolbert and that he agreed with its contents. (M. Jones Dep. 67:25; 68:18-25 – 71:1-16) He noted that the enactment of subsection 28-31(a)(9) has improved safety and that the City has not had any reports of near misses at the crossovers since the enactment of the subsection. (M. Jones Dep. 71:9-25)

2. James E. Tolbert, Director of Neighborhood Development Services for the City of Charlottesville, identified and testified at his deposition on 6/27/13 that he prepared a Memo for Maurice Jones, Acting City Manager, dated July 7, 2010 (**Exhibit 4**). (J. Tolbert Dep. 35:5-10) He based his Memo on discussions with the City traffic engineer and police. In his July 7, 2010 Memo, with regard to the subsection at issue, he advised Acting City Manager Maurice Jones that, "The other area proposed for change is to add a section restricting soliciting within fifty feet of the intersections of the Mall on 2nd Street West and 4th Street East, the Mall crossings. Because of safety reasons, solicitation is already restricted at four other intersections in the community. Our traffic engineer and the police believe that this change will improve public safety on the mall by removing distractions from the conflict point where pedestrians and vehicles meet." (**Exhibit 4**) In preparing the Memo for the City Manager, he had specific reports of near misses in the crossovers, not only from Officer Dwayne Jones, but from other police officers. He also relied on an incident he witnessed involving a near miss of a child walking who was almost hit by a driver engaged with one of the people soliciting. (J. Tolbert Dep. 37:14-22) He also testified to personally observing pedestrians engaged in trying to avoid solicitors or giving money and turning and being caught in the middle of the travel lane at one of the vehicular crossovers. (J. Tolbert Dep. 46:12-25)

3. Mr. Tolbert also drafted the August 2, 2010 City of Charlottesville, Virginia City Council Agenda (**Exhibit 6**) which was provided to the City Council one week in advance of the first reading of the proposed amendments. (C. Brown Dep. 56:14-23) (Relevant portion of

8

Craig Brown's deposition cited within this brief are attached as **Exhibit 10**.)  In the City Council Agenda with regard to Mall crossings, he informed the City Council that, "Solicitation near the Downtown Mall intersections have created several near accidents as witnessed by Police and others, as drivers being solicited are distracted and pedestrians are put in danger as they cross the street.  The proposed amendment restricts solicitations within fifty feet of the intersections of the Downtown Mall at 2nd Street and 4th Street.  The purpose of this is to create a buffer zone where neither drivers nor pedestrians are distracted and to reduce the potential for vehicle and pedestrian accidents." (J. Tolbert Dep. 87:12-25- 90:1-14)  James Tolbert appeared before the City County at both the August 2, 2010 first reading and August 16, 2010 second reading and enactment of the subsection.  He presented the amendment to the ordinance to the City Council in addition to preparing the Agenda for the August 2, 2010 meeting.  He, along with other staff members including City Attorney Craig Brown, recommended approval of the proposed subsection amendments to the ordinance to the City Council.  Mr. Tolbert's presentation, comments, and explanation of the subsections added to §28-31 are memorialized in the video archives of both meetings at www.charlottesville.org and **Exhibit 3**, Affidavit of City Attorney Craig Brown with attached Exhibit B recording.[3]

4. Charlottesville Police Department Sgt. Dwayne Jones has been a Charlottesville Police officer for 24 years.  In 2009 and 2010, he was a Master Patrol Officer on the Daylight Shift assigned to the Downtown Mall.  (D. Jones Dep. 7:4-25; 8:11-21)  (Relevant portion of Sgt. Dwayne Jones' deposition cited within this brief are attached as **Exhibit 11**.)  He testified at his deposition on 8/6/13 to his personal observations of safety problems in connection with the two (2) vehicular crossovers before the 8/16/10 ordinance amendments including subsection 28-31(a)(9).  Specifically, he testified that while watching on bike patrol and foot patrol, he observed panhandlers in the crossovers and noticed that motorists, as they crossed the Mall, were diverting their eye contact from the roadway "to the people that were soliciting".  (D. Jones Dep. 31:17-25; 32:1)  He also testified to his personal observation of

---

[3] The first and second paragraphs of the July 7, 2010 Memo (**Exhibit 4**) and second page of the August 2,2010 City Council Agenda (**Exhibit 5**) detail the basis for the cafe and vendor amendments, §28-31 (a)(5) & (a)(6), which, according to Plaintiffs, are no longer being challenged in this action.

a near miss accident involving a panhandler at the 4th Street crossing prior to enactment of the §28-31(a)(9) amendment to the ordinance. He explained that the driver in front of his police car had stopped for a panhandler in the crossover and made an exchange with the panhandler. The motorist then pulled forward and, as he did so, didn't turn his head. There was a pedestrian crossing the crossover at the time. The motorist accelerated to go forward and suddenly slammed on his brakes, quickly stopping just a foot or two short of the pedestrian. (D. Jones Dep. 31:9-25 – 35:1-2) Sgt. Jones reported both of his observations to James E. Tolbert because he was in charge of Neighborhood Services and he knew that he was the City official who could deal with the report. (D. Jones Dep. 36:17-25; 37:13-18) He also testified that he reported his observations to James Tolbert because it was a safety issue that he was trying to alleviate. Simply stated, he didn't want somebody to get hit. (D. Jones Dep. 38:23-24; 39:1)

## SUBSECTION 28-31(a)(9) IS NARROWLY TAILORED TO FURTHER THE CITY OF CHARLOTTESVILLE'S SUBSTANTIAL INTEREST IN PUBLIC/TRAFFIC SAFETY AND DOES NOT BURDEN SUBSTANTIALLY MORE SPEECH THAN IS NECESSARY TO FURTHER THE GOVERNMENT'S LEGITIMATE INTEREST.

The subsection is narrowly tailored in that it only applies in the crossover area to soliciting, as defined by the Ordinance as a request for immediate donations of money, which directly relates to traffic/public safety interest observed by, among others, Charlottesville Police Department Sgt. Dwayne Jones and the Acting City Manager Maurice Jones. The 50' buffer zone is a reasonable distance and proper exercise of legislative judgment.

1. The City of Charlottesville Traffic Engineer, Jeannie Alexander, testified at her deposition on 6/27/13 that James Tolbert's 7/7/10 Memo to the City Manager accurately reflected her opinion provided to him as the City Traffic Engineer, that the §28-31(a)(9) amendment restricting soliciting within 50' of the 2 vehicular crossovers would improve public safety on the Mall when the Mall crossovers were open to vehicular traffic. (J. Alexander Dep. 27:11-25; 28:1-10; 29:15-21) (Relevant portion of Jeannie Alexander's deposition cited within this brief are attached as **Exhibit 12**.) With respect to the width of the buffer, based on her experience as a traffic engineer and personal observation, 50' was a reasonable distance. She noted that 20' was not enough distance and that 100' was too much. (J.

Alexander Dep. 18:3-20; 30:1-25; 31:1-25; 32:1-7)

2. Following the first reading, §28-31(a)(9) was further narrowed and limited at the recommendation of City Attorney Craig Brown based on his personal observation so that it only applied when the 2 vehicular Mall crossovers were "open to vehicular traffic". (C. Brown Dep. 63:3-25; 64:1-15) It occurred to him that the safety issue the amendment was designed to address was not present when the crossovers were closed. In order to narrow the restriction and allow people to solicit, as defined by the ordinance, next to the cross streets when they were not open, he suggested the amendment to the City Council on 8/16/10 at the second reading, which the City Council accepted. City Attorney Craig Brown's comments and advice to the City Council on First Amendment issues are reflected in the 8/16/10 video archive of the meeting at www.charlottesville.org and **Exhibit 3**, Affidavit of City Attorney Craig Brown with Exhibit B attached thereto recording.

3. James Tolbert, Director of Neighborhood Development Services, who drafted the 7/7/10 Memo (**Exhibit 4**) and 8/2/10 city Council Agenda (**Exhibit 5**), acknowledged that he does not recall who mentioned 50' as the appropriate buffer distance given his observations and those of Sgt. Jones. The City Council determined, after staff recommendations and public hearings, that it was appropriate. He recalled that it was a collaborative decision with the Traffic Engineer and Police Chief as to what distance made common sense, based on observations before enactment of the subsection. (J. Tolbert Dep. 45:16-20; 46:1-25)

4. City Attorney, Craig Brown testified at his deposition with respect to the 50' buffer zone that, " – a line had to be drawn somewhere" and from all the information he had, 50' appeared to be a reasonable distance. His office assisted in drafting the ordinance. Moreover, as he testified, a certain degree of discretion should be left up to the legislative body to define what is a reasonable distance. (C. Brown Dep. 54:22-25; 55:1-15) The City Attorney's position is consistent with the Fourth Circuit's statement in *Brown* citing *Randall v. Sorrell*, 548 U.S. 230 (2006) in which the Fourth Circuit, quoting from *Randall*, noted that, "We cannot determine with any degree of exactitude the precise restriction necessary to carry out (the sign Ordinance's) legitimate objectives. In practice the legislature is better equipped to make such empirical judgments." *Brown* at 304.

AFTER THE ENACTMENT OF THE AMENDMENTS TO §28-31, INCLUDING SUBSECTION (a)(9) AT ISSUE IN THIS CASE, AMPLE ALTERNATIVE AREAS AND CHANNELS OF COMMUNICATION ARE AVAILABLE ON THE DOWNTOWN MALL.

1. The Downtown Mall is a pedestrian mall described by both Plaintiffs Clatterbuck and Martin as 6 – 8 blocks long, something less than 1/4 mile in length. (A. Clatterbuck Dep. 40:17-23) (C. Martin Dep. 26:2-20)

2. Charlottesville Police Department Sgt. Dwayne Jones was a Master Patrol Officer on the Charlottesville Police Department Daylight Shift assigned daily to the Downtown Mall in 2009 and 2010. He testified at his deposition that the Downtown Mall is roughly 1/3 mile long by 60' wide. (D. Jones Dep. 83:12-25; 84:1-18) He also testified that on any given day after enactment of the 2010 amendments, you could see panhandlers all over the Downtown Mall, including the Freedom of Speech Wall, City Transit area, East Market Street parking garage, Paramount Theatre, Central Place, CVS, by the old Wachovia Bank, and near the Ice Arena. He concluded by describing the panhandlers' presence on the Downtown Mall as spread throughout the Mall. (D. Jones Dep. 86:1-25)

3. The ample alternative areas of communication on the Downtown Mall after the enactment of §28-31(a)(9) are graphically depicted in white on the to scale map of the Downtown Mall with color coded legend (Affidavit of James E. Tolbert **Exhibit 2** with attached Exhibit A Mall map attached thereto).

4. Plaintiff Clatterbuck admitted panhandling at multiple specific locations on the Downtown Mall, both before and after the enactment of the amendments at his deposition. Going from East to West, he noted panhandling by the First Amendment Wall, in front of the post office, Paramount Theatre, Blue Moon Diner, outside the Oyster Antique Store, Jefferson Theatre, and the Ice Rink. (A. Clatterbuck Dep. 29 - 39) He agreed that from 2009 until 2013, he has roamed the Mall and panhandled wherever he wanted to, except for the 2 vehicular crossovers. (A. Clatterbuck Dep. 30:15-18) He admitted making the same amount of money panhandling before and after the enactment of §28-31(a)(9). (A. Clatterbuck Dep. 38:22-25; 39:1-13)

5. Plaintiff Martin also testified at his deposition to panhandling at multiple locations on the

Downtown Mall, both before and after the enactment of §28-31(a)(9) until he stopped panhandling on the Downtown Mall in 2012. In fact, he testified that the best locations for making money on the Downtown Mall as a panhandler were the Jefferson Theatre, the flower pots in front of the Oyster House, and the Paramount Theatre. (C. Martin Dep. 17:2-10)

The City of Charlottesville submits that there is no genuine issue of material fact a to the availability of ample areas of communication for panhandlers, including Plaintiffs, on the pedestrian Downtown Mall after the enactment on August 16, 2010 of the amendments to §28-31 of the City of Charlottesville Code.

## CONCLUSION

Section 28-31(a)(9) of the Charlottesville City Code, as well as the other subsections amended or added August 16, 2010 by the City, are reasonable content-neutral time, place, and manner restrictions narrowly tailored to serve a significant government interest in traffic/public safety (as well as, additionally, the right to be left alone with respect to cafes and vendor tables), which leave open ample alternative areas of communication on the Charlottesville pedestrian Downtown Mall. The limited soliciting restrictions imposed by the ordinance are as demonstrated above, reasonably related under *Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013) to the significant and, indeed, compelling interests advanced by the City of Charlottesville.

WHEREFORE, the City of Charlottesville, by counsel, moves the Court to grant its Motion for Summary Judgment and dismiss the Complaint with prejudice.

CITY OF CHARLOTTESVILLE<br>By Counsel

s/Richard H. Milnor
Richard H. Milnor, Esquire (VSB #14177)
Zunka, Milnor & Carter, Ltd.
414 Park Street
P O Box 1567
Charlottesville, VA 22902
Phone: 434-977-0191
Fax:    434-977-0198

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of September, 2013, I electronically filed the foregoing Brief in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

    Jeffrey E. Fogel, Esquire
    Steven D. Rosenfield, Esquire
    ACLU of Virginia
    913 East Jefferson Street
    Charlottesville VA 22902

    Rebecca Glenberg, Legal Director
    ACLU of Virginia
    701 East Franklin Street Suite 1412
    Richmond VA 23219

I further certify that a paper copy of the to scale map of the Downtown Mall and a CD of containing portions the August 2, 2010 and August 16, 2010 Charlottesville City Council meetings relevant to the proposed amendments to §28-31, both attached as exhibits to Affidavits filed with this brief, were previously hand delivered to Attorney Jeffrey Fogel on September 6, 2013.

                                s/Richard H. Milnor