**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| **ALBERT CLATTERBUCK,** : | |
| **CHRISTOPHER MARTIN, EARL** : | |
| **MCCRAW, JOHN JORDAN AND** : | |
| **MICHAEL SLOAN,** : | |
| : | **Civil Action No. 3:11cv00043** |
| **Plaintiffs,** : | |
| : | |
| **vs.** : | |
| : | |
| **CITY OF CHARLOTTESVILLE,** : | |
| : | |
| **Defendant.** : | |

**PLAINTIFFS' MEMO OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF FACTS

Charlottesville's Downtown Pedestrian Mall ("Mall") was opened in 1976, is approximately 1/3 of a mile long and sixty feet wide, and constitutes a portion of Main Street. (Exhibit A., Dwayne Jones dep. at 83-84; Exhibit B, Craig Brown dep. at 32).   From 1976 until the mid to late 1990s, cars were not permitted to cross the Mall. (Exhibit B, Craig Brown dep. at 31-32).   Then, at the request of the owners of the Regal Movie Theater, 2nd Street NW ("2nd Street") was opened to vehicular traffic traveling north across the Mall so that patrons could be dropped off immediately adjacent to the theater. (Exhibit B, Brown dep. at 33).   Ten years

later, the city decided to open a second vehicular crossover at 4th Street NE (hereafter 4th Street) for vehicles traveling south across the Mall (Exhibit B, Brown dep. at 31), despite the position of the police chief that, for safety reasons, cars should not be permitted at all on the Mall.  (Exhibit C, Timothy Longo dep. at 32-33, 55).

In 2002, the City started considering measures to limit or prohibit begging. At that time, key city officials were considering rezoning the Mall into a park with the purpose of prohibiting begging. (Exhibit D,  Memo from Lisa Kelley).  After they were told that legally that could not be done (*id.*), other measures were considered and then adopted limiting the locations where people could "panhandle,"[1] and proscribing "aggressive panhandling."

In 2003, the City adopted an ordinance titled "Panhandling."  City Code. § 28-31.  It prohibited certain forms of aggressive conduct towards others, but only if accompanied by a "request for an immediate donation of money or other thing of value." City Code § 28-31(b)(defining solicit).[2]  The Ordinance also prohibited

_____

[1]According to the city attorney's office, "'begging' and 'panhandling' . . . refer to individuals seeking money for themselves, and the term 'solicitation' or 'charitable solicitation' . . . refer to the type of donations sought by organized groups."  (Exhibit D,  Kelley Memo). Plaintiffs will use the same references.

[2]The ordinance also prohibited requesting an immediate donation of money or other thing of value within 15 feet of an ATM machine or a bank entrance.  Neither of those provisions are

soliciting from certain discrete locations (not at issue here) and prohibited solicitation from four of the major intersections in the city, again limited to requests for an immediate donation of something of value. City Code § 28-31(8). The City had considered an outright ban on solicitation near all intersections but limited the prohibition due to the request of some non-profits who fund raise in that fashion. (Exhibit C, Longo dep. at 28).

In 2010, the City amended the panhandling Ordinance, renamed it "solicitation," and  prohibited "solicitation" within 50' on either side of the two intersecting streets that allow vehicular traffic. City Code § 28-31 (a)(9).[3]  As noted above, solicit is defined as requesting "an immediate donation of money or other things of value." According to the ordinance, "[a] solicitation may take the form of, without limitation, the spoken, written, or printed word, or by other means of communication (for example:an outstretched hand, an extended cup or hat, etc." City Code § 28-31(b).  Also prohibited is soliciting "the sale of goods or services" in the 50' zones. Excluded from the prohibition are other forms of soliciting and all other conduct within those zones.

---

at issue here.

[3]The actual distance is not clear since some officials thought the 50' was measured from the center of the intersecting street and others from the edge. (*Compare* Exhibit E, Alexander dep. at 36, (50' runs from the middle of intersecting streets) with Exhibit A, Dwayne Jones dep. at 14 (50' runs from edge of intersecting streets)).

No one knows who came up with the number 50 feet as the so-called buffer zone nor the rationale for that number. (Exhibit C, Longo dep. at 34, 43; Exhibit E, Alexander dep. at 18;  Exhibit F, Tolbert dep. at 47).[4]  The then city traffic engineer was asked to look at the intersection and give her opinion about a 50 foot "buffer" zone. (Exhibit E, Alexander dep. at 13).  The focus of her concern was distractions at the "point of conflict" where cars and pedestrians meet in proximity to one another. (Exhibit E, Alexander dep. at 36).  Ms. Alexander was only asked to consider the distractions potentially caused by solicitors as defined in the Ordinance. (Exhibit E, Alexander dep. at 37). Although she acknowledged that "there are many distractions in that area," including directional signs[5] [6], posters and attractive displays (Exhibit E, Alexander dep. at 15-17), she supported the proposed zones because "adding another distraction to that [area] seemed not to be a good idea." (Exhibit E, Alexander dep. at 15).  She was asked what kind of

---

[4]In his deposition testimony, Mr. Tolbert, Director of Neighborhood Development Services, stated that the number 50 was based on a collaborative discussion with the traffic engineer and police chief (Exhibit F, Tolbert dep. at 45).  However, in the above cited deposition testimony, both the traffic engineer (Ms. Alexander and the police chief (Mr. Longo) maintained that they had no idea where the number came from.

[5]A photograph that depicts the directional signs is attached to the Declaration of April Wimberley as Exhibit B.

[6]When asked about the distraction of drivers who were looking at the directional signs, she acknowledged the danger but said she hoped that cars would stop as they looked at the signs. (Exhibit E, Alexander dep. at 16).

safety problem is created for either pedestrians or vehicles if someone was

soliciting a pedestrian with his or her back to the vehicles 20 feet away from the

intersecting street.  Her response: "That should not create a traffic safety

problem."  (Exhibit E, Alexander dep. at 24).

All of the City officials agree that they never considered any other

alternatives, including any shorter "buffer" zone and how that might impact the

interests that the City was trying to protect. (*See e.g.* Exhibit B, Brown dep. at 29;

Exhibit C, Longo dep. at 69, 73).

Throughout this period, there was considerable controversy about

panhandlers on the Mall.  *See e.g.* "Panhandling legislation launches debate," The

Daily Progress, August 9, 2010 (available at http://www. dailyprogress.com/

news/panhandling-legislation-launches-debate/article_43bc3521-97ce-57e4-9daf-

5c21cd622923.html; "Perspective: Ugliness in Charlottesville, Richmond Times

Dispatch, July 2, 2011(available at http://www. timesdispatch.com/ news/

free-speech-ugliness-in-c-ville/article_fac4dc1f-c20a-5c73-a2d5-7692fcbee420.ht

ml; "Proposals hurt poor – not to mention liberty," The Daily Progress, November

25, 2012 (available at http:// www. dailyprogress.com/opinion/ guest_columnists/

proposals-hurt-poor----not-to-mention-liberty/article_45686b28-39a6-11e2-a756-

0019bb30f31a.html; "Season of giving: Is panhandling, vagrancy, destroying the

Downtown Mall?"; The Hook, December 6, 2012 (available at http://www.
readthehook.com/108841/season-giving-panhandling- and-vagrancy-destroying-
downtown-mall.  There were vocal calls for prohibiting or limiting the right to beg
on the Mall, independent of any safety concerns. *(See e.g.* Exhibit G, Maurice
Jones dep. at 22; Exhibit B, Brown dep. at 81-2; Exhibit F, Tolbert dep. at 40).

People who beg or panhandle on the Mall typically remain in one location,
with handmade signs asking for donations, usually close to one side of the Mall so
that pedestrians going in both directions can see them. (Exhibit A, Dwayne Jones
dep. at 69).

The City's Interest in the 50' No-Solicitation Zone

The City maintains the four 50' no-solicitation zones are necessary for
pedestrian safety. According to City officials, it was prompted by "specific reports
that those who are standing adjacent to the two cross streets are creating
distractions for both pedestrians and drivers that have led to several near misses."
(Exhibit H, Tolbert Memo, 7/7/10).

The City relies on three distinct rationales for limiting the right to beg in
those zones.  First, is the concern that soliciting from the occupants of vehicles
may distract the drivers, especially those  who may stop and then fail to proceed
with caution. In support of that concern, the City asserts that some city employees

6

had seen drivers distracted by solicitors standing adjacent to the intersecting streets actively soliciting from the drivers of vehicles. In one such incident, a person with a "sign" approached a motor vehicle crossing the Mall at 4th Street. The driver stopped the car, there was an "exchange," and then the driver proceeded but had to brake to avoid hitting a pedestrian. (Exhibit A, Dwayne Jones dep. at 33). Despite the fact that the driver had, in stopping at the street crossing, violated Charlottesville City Code § 15-151 and had failed to yield right-of-way to the pedestrian as required by City Code § 15-75, the officer, who was directly behind that vehicle, said nothing to the driver. (*Id*. at 35). Mr. Tolbert testified that he saw the near miss of a child by a driver who was "engaged with one of the people soliciting, and started their car up without looking." (Exhibit F, Tolbert dep. at 37). Since we don't know whether the solicitor was seeking "an immediate donation of money or other thing of value," we don't know whether the Ordinance would have prevented this and any similar incidents.

Second, the City maintains that the mere presence of beggars or solicitors as far as 50 feet away is distracting to drivers and could cause a driver to strike a pedestrian because of that distraction. As to this concern, the City can point to no incidents or even anecdotes to support its position. One police officer, who was responsible for patrolling the Mall, testified that he had noticed that some

motorists, as they crossed over the mall, were diverting their eye contact from the roadway over to individuals positioned along the crossovers. (Exhibit A, Dwayne Jones dep. at 30).  Aside from the inherent difficulty of being able to identify what another person is looking at in a crowded downtown location, the officer made no effort to determine whether drivers' eyes were diverted by other things, such as his presence or the presence of displays on the Mall.  He was asked, for example whether any of the motorists were looking at him and  his response was: "They may have. I wasn't looking." (Exhibit A, Dwayne Jones dep. at 32). Nor could he answer whether motorists were looking at other objects on the Mall. (*Id*.)

City officials have acknowledged that there are many distractions for pedestrians and drivers on the Mall.  There are detailed instructional signs at the 4th Street crossover and if the driver is looking at those signs, they are not looking at the street or the pedestrians. (Exhibit E, Alexander dep. at 15-16[7]).  There are sandwich boards within the 50' buffer zones that are soliciting the sale of goods and services. (April Wimberley Declaration, ¶2, Exhibit A).  The bank immediately adjacent to the 4th street intersection sometimes has a table in front of

---

[7]Ms. Alexander expressed the hope that drivers would stop to look at the signs.  However, stopping in the intersection raises the precise problem that the City claims it is trying to avoid - drivers distracted close to the point of conflict where pedestrians and vehicles meet.  The same potential exists for drivers, after stopping, not proceeding with appropriate caution.  In addition, stopping on a street crossing is prohibited in Charlottesville.  City Code § 15-151.

its branch on the Mall, but since it appears that no money is changing hands, the City does not seemed concerned. (Exhibit F, Tolbert dep. at 105-106).  There are large, attractive displays promoting the City's various fairs and festivals that could distract drivers and cause a safety issue. (Exhibit E, Alexander dep. at 16-17; Exhibit F, Tolbert dep. at 49).  Even though City officials maintain that soliciting the sale of goods within the 50' zones creates the same exact problem as prohibited soliciting (Exhibit B, Brown dep. at 18-19; Exhibit E, Alexander dep. at 20), the City permits and licenses several vendors who have tables set up within the no-solicitation zone. (Exhibit F, Tolbert dep. at 10, 13;  Wimberley Declaration, ¶¶5,6,  Exhibit C).[8]  Notwithstanding these (and other) sources of distraction for drivers, the City only considered the impact of panhandling.

Third, the City contends that pedestrians, in an effort to avoid panhandlers, may take such extreme diversionary steps (from as far as 50 feet away) as to find themselves in the intersection.  This wildly speculative claim is unsupported by any evidence, anecdotes or by logic. Mr. Tolbert acknowledged that he had not heard any reports of problems created by people soliciting pedestrians as far as 50' away from the intersecting streets. (Exhibit F, Tolbert dep. at 39.).

---

[8]City officials do admit that vendors within the 50' zones are in violation of the Ordinance. (Exhibit B, Brown dep. at 43-44).

## I.     INTRODUCTION

In a public forum, like the Downtown Mall, a place "historically associated with the free exercise of expressive activity," *United States v. Grace*, 461 U.S. 171, 177 (1983), the government's right "to limit expressive activity [is] sharply circumscribed." *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983).  In a public forum, the government may only impose reasonable time, manner and place regulations. *Id.*  When, as here, a regulation is content-based, it is presumptively unconstitutional and the government must show that the restriction is the least restrictive means to further a compelling governmental interest. *See United States v. Playboy Entertainment Group, Inc.*,  529 U.S. 803, 813 (2000).  If it is content-neutral, it must be narrowly tailored to serve a significant government interest.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Committee for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Perry, supra*, 460 U.S. at 45.

Whether characterized as content-based or content-neutral, the government has the burden of justifying the limitation on First Amendment rights.  "When the government defends a regulation of speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Psinet, Inc. v. Chapman*, 362 F.3d 227, 238 (4th Cir.

2004)(citing and quoting *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994)). "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, *supra* at 664. *See also Edenfield v. Fane,* 507 U.S. 761, 770-71, 770-71 (1993)(same); *Perry Educ. Assn., supra* 460 U.S. at 45 (government bears the burden of justifying the regulation of expressive activity in a public forum).

If the government adequately demonstrates that there is a serious problem in need of the regulation it has adopted, even if the regulation is content-neutral, "the Government still bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys., supra*, 512 U.S. at 665 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  The government's burdens are not satisfied by mere recitation, for the court has an "obligation to exercise independent judgment" when reviewing the government's justification for a regulation on speech. *Turner, supra* at 666.

## II.    THE ORDINANCE PROVISION AT ISSUE HERE IS CONTENT-BASED REQUIRING STRICT SCRUTINY.

The Court of Appeals found that the Ordinance "plainly distinguishes between types of solicitations on its face." *Clatterbuck v. City of Charlottesville*,

708 F.3d 549, 556 (4th Cir. 2013).  The question that remains is whether the City

had a content-neutral justification for those distinctions.  As the Court put it, there

must be "a reasonable fit between the content distinction made in the Ordinance  -

singling out requests for *immediate* donations – and the City's justification for that

distinction." *Clatterbuck*, *supra*. at 559 (emphasis in original). *See also Brown v.*

*Entm't Merchants Ass'n.,* 131 S.Ct. 2729, 2740 (2011)("Underinclusiveness raises

serious doubts about whether the government is in fact pursing the interest it

invokes, rather than disfavoring a particular speaker or viewpoint); *City of Ladue*

*v. Gilleo*, 512 U.S. 43, 51 (1994)("an exemption from an otherwise permissible

regulation of speech may represent a governmental 'attempt to give one side of a

debatable public question an advantage in expressing its views to the people.'");

*Carey v. Brown*, 447 U.S. 455, 461 (1980)("When government regulation

discriminates among speech-related activities in a public forum, the Equal

Protection Clause [of the Fourteenth Amendment] mandates that the legislation be

finely tailored to serve substantial state interests, and the justifications offered for

any distinctions it draws must be carefully scrutinized.");  *Police Dept. of the City*

*of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)(striking down an ordinance that

generally prohibited picketing next to a school but allowed labor picketing, "the

crucial question is whether there is an appropriate governmental interest suitably

furthered by the differential treatment."). The inquiry now is "why – not whether – the [City] has distinguished content in its regulation." *Brown v. Town of Cary*, 706 F.3d 294, 301 (4th Cir. 2013). To answer that inquiry, the government must show that the exceptions are substantially related to advancing an important state interest that is at least as important as the interests advanced by the underlying regulation. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 389 (3d Cir. 2010)(cited with approval in *Brown*, *supra*., 706 F.3d at 302).

In *Brown*, the court concluded that a sign regulation, which distinguished speech based on its content, was content-neutral where its "exceptions reasonably advance the legislative interests of traffic safety and aesthetics." As the *Brown* court noted, in *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 434 (4th Cir. 2007), the distinction in the city's sign ordinance between "off-premises" and "on-premises" commercial signs "served a content neutral purpose 'to eliminate confusing, distracting and unsafe signs, assure the efficient transfer of information; and enhance the visual environment of the City of North Charleston.' *Brown, supra*. at 303. Similarly, in *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 364-65 (4th Cir. 2012), the exemption for noncommercial signs was content-neutral since it served to "among other aims, promote traffic safety and the County's aesthetics, interests unrelated to messages displayed." 680 F.3d at 368.

13

In *Melrose, supra*., 613 F.3d at 391, the court found that the distinction in an ordinance between "identification" and "advertising" signs served important state interests, including "public order" and "traffic safety."

The question in this case is why the City chose to distinguish between different types of solicitation.  Do solicitations of motorists that do not involve a request for an immediate donation of something of value not implicate public safety? Does allowing such solicitations serve any other interests of the City?

In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), the Court considered an ordinance that permitted onsite commercial advertising while forbidding noncommercial advertising with exceptions for certain other signs. *Id.* at 494-95.  "The fatal defect of the *Metromedia* ordinance was that San Diego could not 'explain how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the city . . . .'" *Brown v. Town of Cary*, *supra.* 706 F.3d at 303 (quoting *Metromedia*, 453 U.S. at 513).  "Accordingly, it was the relationship – or lack thereof – between the content distinction and the legislative end of traffic safety that convinced the *Metromedia* Court that the city had discriminated for reasons of content." *Brown* at 303.

In *Carey v. Brown*, *supra.*, the Court struck down a state statute that

generally prohibited residential picketing to protect privacy but exempted picketing of a place of employment involved in a labor dispute. The City's interest in protecting the tranquility and privacy of the home was held to be "of the highest order." *Id.* at 471. However, "under the guise of preserving residential privacy, Illinois has flatly prohibited all nonlabor picketing even though it permits labor picketing that is equally likely to intrude on the tranquility of the home." *Id.* at 462. Although the state advanced a number of arguments to justify that distinction, the Court found that "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy." *Id.* at 465. Here, there is nothing in the content based distinction between solicitation for immediate donations of things of value and solicitation for any other purpose that has any bearing on public safety. Anyone soliciting from the occupant of a vehicle crossing the Mall presents precisely the same problem of distracting drivers.

In *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424-426 (1993), the Court considered an ordinance that allowed newsracks for noncommercial periodicals but prohibited such newracks for commercial publications. The Court agreed with the city that its desire to limit the total number of newsracks was "justified" by its interest in safety and esthetics. "The city has not, however, limited the number of newsracks; it has limited (to zero) the number of newsracks

15

distributing commercial publications. As we have explained, there is no justification for that particular regulation other than the city's naked assertion that commercial speech has 'low value.' It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content-neutral. Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship whatsoever to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests."

The question in this case is whether the City can justify the distinctions it drew in the Ordinance and the answer is a resounding no.  The concern with stopping or attempting to stop motor vehicles whose driver may be distracted by that action and then not proceed with appropriate caution while continuing through the Mall has nothing to do with the reason for stopping the vehicle.  The same public safety issue is presented whether the person stopping the vehicle is seeking an immediate donation of something of value or the signature on a petition, or a pledge of future donations, or directional information, or for a variety of other reasons.  Indeed, the legislature has specifically authorized municipalities

16

to enact ordinances broadly prohibiting or regulating efforts to solicit ("contributions of any nature,"), distribute (any materials) or sell goods or services from or to the occupants of motor vehicles. Va. Code § 46.2-931.  However, Charlottesville decided to limit its prohibition to those solicitations which seek an immediate donation of things of value, notwithstanding that all solicitations from or to vehicles present precisely the same public safety issue.  The City's focus was on beggars and its Ordinance reflects that fact.  The one concrete example provided by the City, where an officer observed someone stop a vehicle and "exchange" something with the driver, proves this point, for the officer did not know what was "exchanged" and therefore whether the Ordinance was violated. Regardless of the reason for stopping the vehicle or what was exchanged, the public safety issue was presented.

Thus, the Ordinance leaves unregulated a broad array of behavior that is indistinguishable from soliciting "an immediate donation of money or other thing of value" in terms of any potential threat to pedestrian safety.  Indeed, regulated and unregulated activity is distinguishable only in terms of the particular message conveyed, a distinction that demonstrates not only the lack of a reasonable fit between the Ordinance's means and its professed end but also the City's true intent to discriminate against a particular type of speech, and a particular kind of

17

speaker.

### III.   THE MANY EXCEPTIONS TO THE BAN ON SOLICITING WITHIN 50' OF  THE INTERSECTING STREETS UNDERMINE THE STRENGTH OF THE CITY'S CLAIMED INTEREST IN PROTECTING PEDESTRIANS.

While the City claims that its Ordinance was adopted principally to deal

with the problem of distracting drivers, and thereby endangering pedestrians, it

allows considerable conduct that creates that very problem, undermining its

claimed interest.

According to the safety officials for the City, the principal concern for

pedestrian safety on the Mall is distracting drivers at the "point of conflict," where

cars meet pedestrians in close proximity.  However, the Ordinance allows people

to engage in a variety of activities that can and do distract drivers.  The greatest

danger, according to officials, is stopping cars whose driver may not pay attention

when continuing across the Mall.  Stopping cars is the danger and it does not

matter why the car is stopped.  There is noting about requests for "an immediate

donation of money or other thing of value" that creates a greater danger than any

other request made of a driver.  One can also stop a car to pass out promotional

material, to solicit signatures or to seek a promise of a future donation.  One might

also stop a car in which a friend is driving in order to greet that person or to

deliver a message.  Each of these examples (and many others) create the danger that the City claims to be protecting against.

As previously noted, this "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2740 (2011)(citing City of Ladue v. Gilleo, 512 U.S. 43, 51, (1994); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989)).  It also raises a serious question about the strength of the City's claimed interest.  How serious can its concern about stopping drivers be if it allows people to stop drivers for any reason except if they are seeking "an immediate donation of money or other thing of value."?  How serious is its concern about distracting drivers when it not only allows many distractions in the vicinity of cars but specifically licenses vendors within the 50' no-solicitation zone who solicit the sale of goods and services, something that City officials say creates the same problem as do solicitors?

## IV.   WHETHER OR NOT THE ORDINANCE IS CONTENT-BASED, IT IS NOT NARROWLY TAILORED.

Even assuming that the Ordinance is content-neutral, the City's interest in preventing drivers from being distracted at the "point of conflict," the measure

adopted, preventing a specific form of solicitation within 50' of the "point of conflict," is far greater than necessary to accomplish its goal and thereby "burdens substantially more speech than is necessary to further the government's legitimate interests." *Turner Broad. Sys., supra*, 512 U.S. at 665.

The only legitimate interest of the City is to prevent people from engaging in conduct that presents a public safety hazard at the "point of conflict" between cars and people. As noted, panhandlers, including Plaintiffs, typically sit in a fixed location alongside the edges of the Mall holding a sign seeking contributions. Thus, even the examples cited by City officials of people soliciting directly from cars is a rare occurrence.[9]  As to claimed distraction of drivers by the conduct of solicitors away from the "point of conflict," if the panhandler is facing the same direction as the vehicles or has his or her back to the intersection, the sign cannot even be seen by the occupants of motor vehicles.  As both the city traffic engineer and the police chief testified, in such a scenario, there is no public safety issue. Thus, a considerable amount of soliciting can take place in the no-solicitation zones that has no impact on pedestrian safety even from the City's point of view. The no-solicitation zone sweeps far too broadly, criminalizing a significant

---

[9]It is worth repeating that in none of the examples of this conduct cited by the City is there evidence that the solicitor was requesting "an immediate donation of money or other thing of value," rather than seeking something not covered by the Ordinance.

20

amount protected speech that poses no demonstrable threat to pedestrian safety.

In addition, since a variety of forms of solicitation can take place that are not proscribed, the Ordinance is seriously underinclusive.  In the examples cited by the City of drivers being stopped by "solicitors," there is no evidence that the solicitation was the limited type prohibited by the Ordinance. While the City claims to be concerned about people stopping vehicles, it has only prohibited that conduct when accompanied by a specific form of solicitation.  Similarly, as to the claim that drivers were distracted by the presence of solicitors holding signs - without knowing what the sign said, we cannot conclude that the solicitor was violating the Ordinance.  If drivers are, in fact, distracted by people holding signs, only prohibiting signs that request an immediate donation will not solve the problem presented.  If drivers are not distracted by people without signs, then solicitors of any kind who make verbal requests do not present any public safety issue.

The "essence of narrow tailoring" is having the regulation "focus[] on the source of the evils the city seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n. 7 (1989).  *See also Frisby v. Schulz*, 487 U.S. 474, 485 (1988)("A statute is

narrowly tailored if it targets and eliminates no more than the exact source of the

'evil' it seeks to remedy."); *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 157 n.2 (4th Cir.

1988)(same).

The burden of proof is on the City to demonstrate that its restrictions on

speech are narrowly tailored. *See Board of Trustees v. Fox*, 492 U.S. 469, 480

(1989)("What our decisions require is a 'fit' between the legislature's end and the

means chosen to accomplish those ends. . . . Moreover, since the State bears the

burden of justifying its restrictions, it must affirmatively establish the reasonable

fit we require."). *See also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 668

(1994)(vacating district court decision that content-neutral regulation of speech

was constitutional because facts in the record failed to establish that narrow-

tailoring was met).

No one knows why 50' was chosen as the distance for the no-solicitation

zones at issue.  City officials agree that no other alternatives were considered

when it adopted the zones.  Since the City has the burden of proving that its

restriction is narrowly tailored, it cannot succeed as it never considered any

alternatives.[10]  In fact there are a number of less restrictive approaches that could

_____

[10]The City is likely to suggest that the provision which allows solicitation when the intersecting streets are not open to traffic proves narrow tailoring.  That is not a matter of narrow tailoring but rather eliminating a regulation of free speech when the City has no basis to claim an interest in restricting that speech.

address the public safety issue without burdening speech.

Of course, the most effective way to deal with the potential for conflict between cars and pedestrians, as urged by the police chief, would be to revert to the two-decade era when cars were not permitted on this "pedestrian" Mall. This remedy would not impact free speech. The City also has various traffic regulations, already in place, that directly address the potential public safety concerns. City Code § 15-151 prohibits any person from allowing a vehicle to park or stand upon a street crossing. City Code § 15-75 requires drivers to yield the right-of-way to a pedestrian crossing a street. Va. Code § 46.2-888 prohibits people from stopping a vehicle "in such a manner as to impede or render dangerous the use of the highway by others." Va. Code § 46.2-818 prohibits people from stopping the vehicle of another for the purpose of impeding its progress. Virginia prohibits pedestrians from entering or crossing an intersection in disregard of approaching traffic and requires drivers to yield the right-of-way to pedestrians at crosswalks. Va. Code § 46.2-924

If the City enforced these regulations, the problem of cars stopping and then not looking as they proceeded would be curtailed at a minimum cost to free speech. The City could also  prohibit persons from stopping or attempting to stop a motor vehicle while crossing the Mall, an alternative that more effectively and

directly deals with the public safety issue with minimal impact on free speech. The City could also adopt the broad prohibitions allowed by state statute and focused on the very problem of driver distraction sought to be addressed. After all, as Chief Longo noted, the focus has to be on cars since that is what is going to cause a public safety issue.

If the City is concerned about the actual conduct of panhandlers, interfering with pedestrians right to move freely about the Mall, it could enforce its prohibition on aggressive panhandling. City Code § 28-31 (a)(1), (b)(1-5), *inter alia,* prohibits solicitors from (1) making physical contact, (2) approaching or following the person being solicited if likely to cause a reasonable person to fear harm or reasonably likely to intimidate the person being solicited, (3) continuing to solicit after a negative response (if reasonably likely to have the same effect), (4) intentionally or recklessly blocking the safe or free passage of the person being solicited or requiring the person to take evasive action to avoid physical contact, or (5) using language or gestures likely to cause a reasonably person fear harm or to feel intimidated into giving a donation.  Enforcing these provisions would eliminate any conduct by panhandlers that could logically and reasonably cause a pedestrian to have to take extreme evasive actions as far as 50' from the intersection that might somehow put them in danger.

If the interest the City seeks to protect is pedestrian safety, why doesn't Charlottesville regulate behavior that threatens pedestrian safety directly, rather than attacking the problem, at best indirectly, by banning a certain category of speech?  There are obvious alternatives that directly address the issue of pedestrian safety, principally rely on existing laws and that have little impact on free speech.  Since the Ordinance in question is content-based and subject to strict scrutiny, any of these less restrictive measures should doom the ordinance.  Even if construed as content-neutral "if there are numerous and obvious less-burdensome alternatives to the restriction on . . . speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13 (1993). *See Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637 (1980)("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider v. State of New Jersey*, 308 U.S. 147, 162 (1938)("There are obvious methods of preventing littering. Among these is the punishment of those who actually throw papers on the streets. . . . Frauds may be denounced as offenses and punished by law. Trespasses may

similarly be forbidden."); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949-950 (9th Cir. 2011)(en banc)(holding that ordinance that prohibited soliciting from an occupant of motor vehicle was not narrowly tailored, in part, because city could achieve its interests by enforcing existing traffic laws); *Casey v. City of Newport, R.I.*, 308 F.3d 106, 120 (1st Cir.2002) (considering a ban on amplification, the court found that the city had failed to carry its burden to establish narrow tailoring where "the record was devoid of any explanation of why the alternative of enforcing the City's noise ordinance . . . would not have achieved the City's objective as effectively as the amplification ban, while placing a substantially lesser burden on speech").  "If the First Amendment means anything, it means that regulating speech must be a last - not first- resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

Because the provision at issue is overinclusive, by prohibiting speech that does not create a safety issue, and underinclusive, by allowing extensive exceptions that create the same potential safety issue, because there are effective measures in place or that could be adopted that would directly impact public safety without burdening speech, the 50' no-solicitation provision is not narrowly tailored and therefore violates the First Amendment.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment on

liability should be granted.

Respectfully submitted,
ALBERT CLATTERBUCK and CHRISTOPHER
MARTIN,
By counsel

s/Jeffrey E. Fogel
Jeffrey E. Fogel, VSB #75643
Attorney at Law
913 E. Jefferson Street
Charlottesville, VA 22902
Tel 434-984-0300

Steven D. Rosenfield, VSB #16539
913 East Jefferson Street
Charlottesville, VA 22902
Tel 434-984-0300

Rebecca K. Glenberg (VSB #44099)
American Civil Liberties Union of
Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
Tel  804- 644-8080

September 25, 2013

27

## CERTIFICATE

I hereby certify that on September 25, 2013 I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send information of such filing to the following:

Richard H. Milner (VSB#14177)
Zunka, Milnor & Carter, Ltd
414 Park Street
Charlottesville, VA 22902

s/ Jeffrey E. Fogel