```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE WESTERN DISTRICT OF VIRGINIA
 3                   Charlottesville Division
 4     *******************************************************
 5     ALBERT CLATTERBUCK,
       CHRISTOPHER MARTIN,
 6     EARL McCRAW, JOHN JORDAN
       and MICHAEL SLOAN,
 7
                       Plaintiffs,
 8
            -vs-                            Case No.
 9                                          3:11-cv-00043

10     CITY OF CHARLOTTESVILLE,

11                 Defendant.

12     *******************************************************

13
                     DEPOSITION OF JEANIE ALEXANDER
14
                      10:00 a.m. to 10:40 a.m.
15
                           June 27, 2013
16
                      Charlottesville, Virginia
17
```

COPY

EXHIBIT 12

```
24     Job No. 22326
25          REPORTED BY:  Kimberly A. Adderley, RPR, RMR
```

```
 1        A.    Yes.
 2        Q.    You have a degree?
 3        A.    I went to the University of Virginia
 4   and got a bachelor's degree in civil engineering.
 5   I'm also a Registered Professional Engineer in the
 6   State of Virginia, which requires that you take an
 7   exam early on.  I think it was actually my fourth
 8   year in school when I took that, in the spring.
 9   You have to pass that and then you have to have
10   four years of experience supervised by a
11   professional engineer, and then you can sit for
12   the professional engineering exam.  And then once
13   you pass that, you are it.
14        Q.    But, the professional engineering exam,
15   was it specific to traffic engineering?
16        A.    No.  It's specific to civil
17   engineering, with a transportation -- you can
18   choose a concentration, transportation, but there
19   is no specific focus on traffic engineering.
20   But -- go ahead.
21        Q.    Well, I will let you finish.  I promise
22   I will try.
23              Were there other traffic engineers in
24   the department at the time that you were employed?
25        A.    Yes.  Initially when I started, no.
```

```
 1        Q.    That's what we are talking about?
 2        A.    Yes.
 3        Q.    Now, the City adopted an ordinance
 4   restricting or prohibiting soliciting within
 5   50 feet of the intersection to the Mall.
 6        A.    Uh-huh.
 7        Q.    Were you consulted about that?
 8        A.    Yes.  That's part of the memo.
 9        Q.    How did you come up with 50 feet?
10        A.    I did not actually produce the number
11   myself, but --
12        Q.    Who did?
13        A.    I assume Jim, but you will have to ask
14   him if he came up with the number.  Twenty feet
15   isn't enough.
16        Q.    Isn't enough for what?
17        A.    To try and clear out an area without
18   any additional distraction.  And 100 feet is too
19   much.  So, 50 is a reasonable number, easy to
20   remember, in the middle.  And --
21        Q.    Well -- I'm sorry.
22        A.    Go ahead.
23        Q.    And we are talking here about what is
24   included in the ordinance, which was prohibiting
25   soliciting of money or other things of value or
```

```
 1      A.      The traffic engineer.
 2      Q.      The traffic engineer?
 3      A.      Yeah.
 4      Q.      Okay.  So, your initial supervisor was
 5  Angela Tucker, who then reports to Jim Tolbert?
 6      A.      Uh-huh.
 7      Q.      So, is he the top boss --
 8      A.      Yes.
 9      Q.      -- in your division?
10      A.      Yes.
11      Q.      Okay.  Now, if you would look at
12  Plaintiffs' Exhibit 1, which we will also ask to
13  be marked as Defense Exhibit 1, going down to --
14  well, you reviewed this memo, I think you
15  testified, to make sure what was said about you
16  was correct; is that right?
17      A.      Yes.
18      Q.      And is what is attributed to -- the
19  traffic engineer identified in the third paragraph
20  at the bottom of page 1 of Exhibit 1, that traffic
21  engineer is you; is that correct?
22      A.      Yes, that's correct.
23      Q.      You were the one and only at that --
24  well, actually there was an assistant.
25      A.      Right.  But this was me.
```

```
 1        Q.    You were the traffic engineer?
 2        A.    Yeah.
 3        Q.    And what it says, "Our Traffic Engineer
 4   and the Police believe that this change will
 5   improve public safety on the Mall," is that true?
 6        A.    I believe so.
 7        Q.    And is that what you believed then?
 8        A.    Yes.
 9        Q.    And you believe that now?
10        A.    Yes.
11        Q.    And that it was by removing
12   distractions from the conflict point where
13   pedestrians and vehicles meet; is that accurate?
14        A.    Yes.
15        Q.    Now, what are conflict points?
16        A.    Conflict points are any location,
17   whether it be a road, a sidewalk, driveways, mall
18   crossings, where two modes of transportation,
19   whether it be the same or different, conflict, and
20   they are going in opposite directions.  An
21   intersection on a 4-lane divided highway, there
22   are 36 conflict points, if that gives you an idea.
23   I would actually say the mall crossings compete
24   with that just by the sheer number of pedestrians
25   that cross.  But...
```

1    Q.   I was going to ask you about that.  So,
2 with pedestrian crossings, a pedestrian mall with
3 a street crossing it, does that have more conflict
4 points than a normal intersection where you have
5 four streets?
6    A.   Depends on the time of day.  Because --
7    Q.   Number of people?
8    A.   Number of people.  And it also depends
9 on the traffic control at the intersection.  If
10 you put a traffic signal in, it reduces the number
11 of conflict points because you are controlled by
12 the signal as a red indication and, therefore, you
13 are not in conflict with a cross movement, because
14 you are legally told to stop.
15    Q.   If the mall crossing is not open to
16 vehicular traffic, does that remove that problem?
17    A.   Yes.
18    Q.   So, is this problem then, conflict
19 point, only present while the crossing is open for
20 vehicular traffic?
21    A.   Yes.
22    Q.   Now, the sentence above that, if you
23 would look at it, would you read that out loud?
24    A.   The one that starts with "because"?
25    Q.   "The other."

```
 1        A.    Oh.   "The other area proposed for
 2   change is to add a section restricting soliciting
 3   within 50 feet of the intersections of the Mall
 4   and 2nd Street West and 4th Street East, the mall
 5   crossings."
 6        Q.    Now, the 50 feet, you were asked about
 7   that, and I think you said that 50 feet was
 8   reasonable in your opinion?
 9        A.    Uh-huh.
10        Q.    Based on your experience?
11        A.    (Nods head).
12        Q.    Is that right?
13        A.    Yes.
14        Q.    And is that in addition to your -- by
15   experience, you mean your training and education,
16   is that included in experience?
17        A.    Yes.
18        Q.    And what about personal observation?
19        A.    Yes.
20        Q.    Did you personally observe these
21   intersections?
22        A.    It's the combination of both, having
23   ears [years] of experience --
24        Q.    Well, did you personally observe these?
25        A.    -- and also seeing it on the site
```

1   itself, together help you draw a conclusion.
2       Q.   And from that, from both of those
3   sources, then did you draw the conclusion that
4   this vehicular crossing on a pedestrian mall, that
5   there were conflict points created by people
6   soliciting?
7       A.   Yes.  Again, any distraction to the
8   drivers or the pedestrians at the point where they
9   intersect just creates more opportunity for
10  someone to be in a safety issue.
11      Q.   Now, you were asked about a
12  hypothetical about people with their backs to the
13  crossing on the Mall at maybe 25 feet.  Do you
14  remember that?
15      A.   Uh-huh.
16      Q.   Now, those people might not be visible
17  to the car; is that not right?
18      A.   (Nods head).
19      Q.   Is that yes?
20      A.   I would assume yes.  The key to that
21  question is that those people are not visible to
22  the cars.
23      Q.   By the same token though, if the
24  pedestrian approaching that person who was 25
25  feet, rather than 50 feet, did not want to be

(fax) (434) 975-5400
production@cavalier-reporting.com
Cavalier Reporting & Videography
(direct) (434) 293-3300
www.cavalier-reporting.com

```
 1   solicited and took an evasive maneuver, would that
 2   present a problem to vehicles and the pedestrians
 3   in the Mall?
 4        A.   It potentially could.  I think that is
 5   where earlier when I said 20 feet is not enough,
 6   100 feet is too much, 50 feet would avoid that
 7   issue altogether.
 8        Q.   Okay.  And if you would look at the
 9   second sentence in that last paragraph.
10        A.   Uh-huh.
11        Q.   Would you read that?
12        A.   Sure.  "Because of safety reasons,
13   solicitation is already restricted at four other
14   intersections in the community."
15        Q.   Now, in this section that was proposed
16   to be added restricting soliciting within 50 feet
17   of the intersections on those two cross streets,
18   do you agree that this was being done for safety
19   reasons?
20        A.   Yes.
21        Q.   Now, it refers to, though, solicitation
22   already being restricted in four other
23   intersections in the community.  Are you familiar
24   with those?
25        A.   No.  That happened before I was the
```

```
 1   witnesses that happen.  On these specific times,
 2   it may or may not have happened.  It's part of the
 3   Mall experience.
 4        Q.   I'm sorry, I don't quite understand.
 5        A.   There are people soliciting things on
 6   the Mall frequently.
 7        Q.   Right.
 8        A.   And pedestrian avoiding them.
 9        Q.   Right.
10        A.   I would say most of the time.
11        Q.   Right.
12        A.   So, whether that happened specifically
13   when I went down to look at this issue or not,
14   it's part of what I know of this location.
15        Q.   Generally on the Downtown Mall?
16        A.   Yeah.
17        Q.   But, did you ever make any specific
18   observations of people making diversionary tactics
19   to avoid solicitors right near the conflict points
20   that you are talking about?
21        A.   I cannot recall that specific incident
22   happening.
23        Q.   Or seeing that or having observed that?
24        A.   Yeah.  Right in those crossings, right.
25        Q.   Is there anything in your opinion
```

# DEPOSITION ERRATA SHEET

Our Job No. 22326
Case Caption: Clatterbuck vs Charlottesville
Deposition Date: June 27, 2013

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ___3___ day of __August__, 2013.

_____
JEANIE ALEXANDER

Subscribed and sworn before me this _3rd_ day of _August_, 2013, in _Albemarle Co, Virginia_.

_Anna L Bainbridge_
Notary Public

Notary Public, Virginia
Commonwealth at Large
Anna L Bainbridge
ID# 306392
My Commission Expires: 11-30-13

My Commission Expires: _Nov. 30_, 20_13_.

Notary Public Registration No. _306392_.

ORIGINAL

(434) 293-3300
www.cavalier-reporting.com
Reported by Kimberly A Adderley
Cavalier Reporting & Videography
(800) 972-1963
info@cavalier-reporting.com

Job # 22326     Clatterbuck et al v. City of Charlottesville     Page 49
Jeanie von Bernuth Alexander     6/27/2013

DEPOSITION ERRATA SHEET

Page No. 15 Line No. 2 Change to: add "not" between were and in (line #3)

Reason for change: incorrect

Page No. 15 Line No. 3 Change to: remove word "not"

Reason for change: incorrect

Page No. 23 Line No. 20 Change to: replace "is" with "it"

Reason for change: typographical error?

Page No. 30 Line No. 23 Change to: replace "ears" with "years"

Reason for change: typographical error?

Page No. 39 Line No. 25 Change to: replace "been" with "seen"

Reason for change: typographical error?

Page No. 40 Line No. 1 Change to: replace "witnesses" with "witness"

Reason for change: typographical error?

Page No. 41 Line No. 11 Change to: insert "of" between "observation" and "some"

Reason for change: word omitted

SIGNATURE:_____ DATE:_____

JEANIE ALEXANDER

ORIGINAL

(434) 293-3300     Reported by Kimberly A Adderley     (800) 972-1993
www.cavalier-reporting.com     Cavalier Reporting & Videography     info@cavalier-reporting.com

```
1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2         I, Kimberly A. Adderley, RPR, RMR,
3    Notary Public in and for the Commonwealth of
4    Virginia at Large, and whose commission expires
5    October 31, 2015, do certify that the aforementioned
6    appeared before me, was sworn by me, and was
7    thereupon examined by counsel; and that the
8    foregoing is a true, correct, and full transcript of
9    the testimony adduced.
10        I further certify that I am neither related to
11   nor associated with any counsel or party to this
12   proceeding, nor otherwise interested in the event
13   thereof.
14        Given under my hand and notarial seal at
15   Charlottesville, Virginia, this 7th day of July,
16   2013.
17
18
19
20
21             Kimberly A. Adderley, RPR, RMR
22              Notary Registration No. 273323
23            Commonwealth of Virginia at Large
24
25
```