**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

ALBERT CLATTERBUCK, ET AL.,

*Plaintiffs,*

v.

CITY OF CHARLOTTESVILLE,

*Defendant.*

CIVIL ACTION No. 3:11-cv-00043

MEMORANDUM OPINION

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiffs, individuals described in their complaint as "impecunious and reliant to a certain extent on begging" for sustenance, challenge the constitutionality of a subsection of the City Code of Charlottesville, Virginia that prohibits individuals from soliciting immediate donations near two streets running through the Downtown Mall. The matter is now before me upon consideration of the parties' cross-motions for summary judgment, which have been fully briefed and heard and supplemented. For the reasons stated herein, I find that the City of Charlottesville (the "City," or "Defendant") has failed to carry its burden of showing the content-neutrality of the ordinance, which "plainly distinguishes between types of solicitations on its face." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556 (4th Cir. 2013). Indeed, the record before me compels me to conclude that "the City 'has distinguished [speech] *because* of its content,'" and the ordinance "is consequently content-based." *Id.* (quoting *Brown v. Town of Cary*, 706 F.3d 294, 301 (4th Cir. 2013)). Accordingly, the City's motion for summary judgment will be denied, Plaintiffs' motion for summary judgment will be granted, and Plaintiffs' request for relief will be granted as set forth in the order accompanying this memorandum opinion.

**I.**

The complaint originally challenged the following provisions of the Charlottesville City Code:

Sec. 28-31. - Soliciting.

(a)    It shall be unlawful for any person to solicit money or other things of value, or to solicit the sale of goods or services:

* * *

(5)    From or to any person seated within an outdoor café area, during the hours of operation of such outdoor café;

(6)    From or to any person who is conducting business at any vendor table or cart;

* * *

(9)    On the Downtown Mall within fifty (50) feet (in any direction) of 2nd Street West and 4th Street East, when those streets are open to vehicular traffic.

(b)    For the purposes of this section the following words and phrases shall have the meanings ascribed to them below, unless a different meaning is plainly required by the context:

* * *

*Solicit* means to request an immediate donation of money or other thing of value from another person, regardless of the solicitor's purpose or intended use of the money or other thing of value. A solicitation may take the form of, without limitation, the spoken, written or printed word, or by other means of communication (for example: an outstretched hand, an extended cup or hat, etc.).

(c)    Any person violating the provisions of this section shall be guilty of a class 3 misdemeanor.

Charlottesville City Code, § 28–31 (as amended Aug. 16, 2010).

The City moved "to dismiss the action for lack of standing and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively." *Clatterbuck*,

-2-

708 F.3d at 552.  I found that Plaintiffs "had standing, but dismissed the action for failing to allege a cognizable First Amendment violation," reasoning that the ordinance "constitutes a content-neutral, permissible time, place, and manner restriction" on Plaintiffs' free speech rights under the First Amendment.  *Id*.

Plaintiffs appealed my "decision to dismiss the action, and the City cross-appealed to challenge [my] determination that [Plaintiffs had] standing to bring their claim."  *Id*.  As the Court of Appeals noted, Plaintiffs "initially challenged several provisions of the Ordinance," but they limited "their argument on appeal to a facial challenge of subsection (a)(9)," *i.e.*, the subsection prohibiting individuals from soliciting immediate donations near two streets running through the Mall.  *Id*. at 551 n. 1.

The Court found that Plaintiffs had standing, *id*. at 552-54, but reversed and remanded on the merits, disagreeing, *id*. at 556, with my conclusion

> that the Ordinance is content-neutral because it "does not distinguish between favored and disfavored solicitation," *Clatterbuck v. City of Charlottesville*, 841 F. Supp. 2d 943, 953 (W.D. Va. 2012), but rather "applies to all forms of solicitations, regardless of the solicitor's purpose or the content of the solicitor's speech," *id*. at 950.

The Court of Appeals determined that

> [t]he Ordinance plainly distinguishes between types of solicitations on its face. Whether the Ordinance is violated turns solely on the nature or content of the solicitor's speech:  it prohibits solicitations that request immediate donations of things of value, while allowing other types of solicitations, such as those that request future donations, or those that request things which may have no "value"—a signature or a kind word, perhaps.

708 F.3d at 556.  Thus, "[h]aving determined that the Ordinance's speech restriction is based on a content distinction," the Court observed that the "pragmatic . . . approach to evaluating content neutrality" that it has adopted "[i]n evaluating challenges to municipal sign ordinances" turns

next to the question "whether the City 'has distinguished [speech] *because* of its content,' and [the Ordinance] is consequently content-based." *Id.* (quoting *Brown*, 706 F.3d at 301; other citations omitted).  The Court stated that it was

> bound—like the district court—to evaluate Appellants' claims based on the sufficiency of their pleadings, not based on the government's asserted evidence or our own independent judgment of likely purposes.  We find ourselves ill-equipped to reach a conclusion as to censorial purpose, based on the record before us, at this juncture.  We are compelled to conclude that the district court erred in finding the Ordinance content-neutral as a matter of law and dismissing the case on a Rule 12(b)(6) motion to dismiss.

*Id.*

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 250.  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317,

322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

When faced with cross-motions for summary judgment, the standard is the same. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Trigo v. Travelers Commercial Ins. Co.*, 755 F. Supp. 2d 749, 752 (W.D. Va. 2010). The mere existence of "*some*" factual disputes will not defeat summary judgment; the dispute must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247–248; *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Only legitimate disputes over facts that might affect the outcome of the suit under the governing law fall within that category. *Id.*; *see also Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012).

## III.

### A.

The Court of Appeals was concerned that "no evidence is properly before us to indicate the City's reason or reasons for enacting the Ordinance." *Clatterbuck*, 708 F.3d at 558. Although the City had "advanced some plausible arguments that it enacted the Ordinance without any censorial purpose and with a compelling, content-neutral justification," and there was support for the City's "rationales . . . in First Amendment jurisprudence," the Court observed that, "[w]ithout any facts before us pertaining to the government's reasons for enacting the Ordinance . . . forming conclusions about these asserted purposes becomes mere conjecture."

*Id*. at 558-59 (citations omitted).  The Court added that, in the precedents discussed by the Court and those "proffered by the City to support content-neutrality, the government's justification for the regulation was established in the record, and the court was able to weigh evidence supporting that justification." *Id*. at 559 (citations omitted).

The Court concluded that, because "no such findings or evidentiary record exist here. . . .  we cannot determine the City's purpose in enacting the Ordinance or assess the strength of its underlying concerns," and "we cannot be sure of a reasonable fit between the content distinction made in the Ordinance—singling out requests for *immediate* donations—and the City's justification for that distinction." *Id*. (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012); *Brown*, 706 F.3d at 303-04).

> Beyond our inability to determine that the Ordinance is content-neutral, without evidence about the City's purpose we are further unable to weigh how compelling the City's interest is, nor whether the Ordinance is narrowly tailored to that interest. Similarly, without any evidence in the record about the Downtown Mall itself, we have no way of determining that the Ordinance leaves open ample alternative means of communication.

*Id*.

Given the precedents in First Amendment jurisprudence,[1] one would expect that the City

---

[1] *See*, *e.g.*, *United States v. Kokinda*, 497 U.S. 720, 733–34 (1990) ("Solicitation impedes the normal flow of traffic. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card." (Citations omitted.)); *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 705 (1992) (Kennedy, J., concurring) ("In-person solicitation of funds, when combined with immediate receipt of that money, creates a risk of fraud and duress that it well recognized, and that is different in kind from other forms of expression or conduct."); *Madsen v. Women's Health Center*, 512 U.S. 753, 768 (1994) (holding that the state "also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks. . . ."); *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) (recognizing state interest in safety and convenience of citizens using public

(continued...)

would be able to present a strong record in support of sound, practical arguments justifying subsection (a)(9) of the ordinance.  But the record here, discussed below, underscores the strength of Plaintiffs' arguments and defeats the City's only serious argument, which is that the City has a significant interest in pedestrian safety.[2]

Under the Fourth Circuit's "pragmatic rather than formalistic approach to evaluating content neutrality," *Clatterbuck*, 708 F.3d at 556 (citing *Wag More Dogs*, 680 F.3d at 366; *Brown*, 706 F.3d at 301-03),

> not every content distinction merits strict scrutiny; instead, a distinction is only content-based if it distinguishes content "with a censorial intent to value some forms of speech over others to distort public debate, to restrict expression because of its message, its ideas, its subject matter, or to prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."

---

[1](...continued)

fora); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) (recognizing state interest in safety and convenience on public roads); *Brown*, 706 F.3d at 304-05 (finding at summary judgment stage that a sign regulation, which distinguished speech based on its content, was content-neutral where its "exemptions reasonably advance the legislative interests of traffic safety and aesthetics," and the government "adequately documented its aesthetic concern"); *Thayer v. City of Worcester*, 755 F.3d 60, 68 (1st Cir. 2014) ("The ordinances adopted here come with a preamble and accompanying evidence that provide good reason to accept the ostensible objects of the ordinances as the true ones, that is, not suppressing certain kinds of messages but regulating their delivery. The first of these reasons is the fairness of the City's working premise that there are particular, commonly acknowledged circumstances, unrelated to the expression of particular views and messages, in which solicitation can cause serious apprehensiveness, real or apparent coercion, physical offense, or even danger to the person addressed or to all parties."); *Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997) ("There are unquestionable benefits from regulating peddling, First Amendment or otherwise, [including] the control of congestion."). *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) ("The city has a legitimate interest in promoting the safety and convenience of its citizens on public streets. . . . The city determined that vocal requests for money create a threatening environment or at least a nuisance for some citizens.").

[2] The City argues, for example, that its "assistance to the homeless and impoverished" and its approval of "the location of the First Amendment Wall on the Downtown Mall right outside of City Hall" show that it acted without censorial intent in enacting Charlottesville City Code § 28-31(a)(9). These actions by the City are irrelevant to "deciphering censorial intent," where courts look "to the 'relationship—or lack thereof—between the content distinction and the legislative end.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556 (4th Cir. 2013) (quoting *Brown v. Town of Cary*, 706 F.3d 294, 303 (4th Cir. 2013)).  And, as Plaintiffs point out, when Plaintiffs appealed my ruling on the City's motion to dismiss, the Thomas Jefferson Center for the Protection of Free Expression, which built and maintains the First Amendment Wall, filed an amicus brief on Plaintiffs' behalf.  *Id.* at 551.

*Id*. (quoting *Brown*, 706 F.3d at 301–02).  "In deciphering censorial intent," courts look "to the 'relationship—or lack thereof—between the content distinction and the legislative end.'"  *Id*. (quoting *Brown*, 706 F.3d at 303).  The point is to examine "whether the government's content-neutral justification reasonably comports with the content distinction on the face of the regulation."  *Id*. (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994) ("[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content.").

Here, the City's asserted justifications do not comport with the "content distinction on the face of the regulation," *id*.; indeed, the record here discloses a complete "'lack'" of a "'relationship . . . between the content distinction and the [City's stated] legislative end,'" *id*. (quoting *Brown*, 706 F.3d at 303).

*B.*

The Downtown Mall in Charlottesville is a pedestrian mall, approximately sixty feet wide, constituting about a third of a mile portion of Main Street.  The Mall opened in 1976, and until the 1990s, it was strictly a pedestrian mall, with no cross-streets open to vehicular traffic.  In the mid-1990s, the owners of the Regal Movie Theater, at the corner of Main Street and 2nd Street NW, requested that 2nd Street be opened to one-way vehicular traffic traveling north across the Mall so that patrons could be dropped off immediately adjacent to the theater.  The request was granted and, ten years later, the City opened a second one-way vehicular crossover at 4th Street NE for vehicles traveling south across the Mall—despite the opinion of the chief of police that, for safety reasons, no automobiles should be permitted on the Mall.

In 2002, as the City began considering measures to limit or prohibit begging, city officials asked the Office of the City Attorney for its opinion "whether, in connection with upcoming

changes to the City's zoning ordinance and zoning map, the City could zone the Downtown Pedestrian Mall a 'public park' and then prohibit all panhandling activity in that public park area." The City Attorney's answer, in short, was that, "regardless of the zoning of the area in which the activity is occurring, . . . any ordinance amounting to an outright ban of panhandling in all public parks or other public areas would not pass Constitutional muster."[3]

Other alternatives were considered, and in 2003 the City adopted an ordinance titled "Panhandling," which prohibited certain forms of aggressive conduct towards others, but only if accompanied by a "request for an immediate donation of money or other thing of value." The ordinance also prohibited requesting an immediate donation of money or other thing of value within 15 feet of an ATM machine or a bank entrance and soliciting at certain specific locations, including four of the City's major intersections. The City also considered an outright ban on solicitation near all intersections, but limited the expansion of that restriction at the request of some non-profits who fund-raise at traffic intersections.

In 2010, the City renamed the "Panhandling" ordinance, styling it "Soliciting," and amended it to prohibit soliciting "[o]n the Downtown Mall within fifty (50) feet (in any direction) of 2nd Street West and 4th Street East, when those streets are open to vehicular traffic."[4] As previously discussed, "solicit" is defined as a request for

---

[3] The parties have adopted the City Attorney's 2002 note regarding the usage of "the words 'begging' and 'panhandling' to refer to individuals seeking money for themselves, and the term 'solicitation' or 'charitable solicitation' to refer to the type of donations sought be organized groups." The City Attorney further opined that, "[i]n terms of the applicable legal analysis, however, the terms are probably interchangeable."

[4] Throughout this period, there has been considerable controversy about panhandlers on the Downtown Mall. There were vocal calls for the City to prohibit or limit the right to beg on the Mall, regardless of any safety concerns. *See*, *e.g.*, "Panhandling legislation launches debate," *The Daily Progress*, August 9, 2010; "Perspective: Ugliness in Charlottesville," *Richmond Times Dispatch*, July 2, 2011;
(continued...)

an immediate donation of money or other thing of value from another person, regardless of the solicitor's purpose or intended use of the money or other thing of value.  A solicitation may take the form of, without limitation, the spoken, written or printed word, or by other means of communication (for example: an outstretched hand, an extended cup or hat, etc.).

The ordinance also prohibits soliciting "the sale of goods or services" in the fifty-foot zones.

The zones of fifty feet are problematic.  The record discloses that no one can recall with any certainty who came up with the magic number of fifty feet for the so-called "buffer" zone, nor the rationale for that distance, or even whether a fifty-foot buffer zone is measured from the center of an intersecting street (running north-south) or from the edge of an intersecting street.[5] Ms. Alexander, the city traffic engineer at the time the fifty-foot buffer zone was devised, gave deposition testimony that she was asked to study the intersection and give her opinion about a fifty-foot buffer zone.  She stated that the focus of her concern was "distractions" at the "point of conflict," where cars and pedestrians come into proximity.  She affirmed that she was specifically asked "to look at . . . only the distractions potentially caused by solicitors," as soliciting was defined in the ordinance, and she stated that she "was not asked to look at any other distractions."  She acknowledged, for example, that her examination did not "include people who were playing music close to those intersecting streets," because "[t]hat was not part of the discussion."

Ms. Alexander further acknowledged that "there are many distractions in that area," not

---

[4](...continued)
"Proposals hurt poor – not to mention liberty," *The Daily Progress*, November 25, 2012; "Season of giving: Is panhandling, vagrancy, destroying the Downtown Mall?" *The Hook*, December 6, 2012.

[5] Mr. Tolbert, the City's Director of Neighborhood Development Services, stated that the number of feet was based on a "collaborative discussion" with the traffic engineer and the chief of police, both of whom maintain that they do not know how the number of feet was determined.  All of the city officials acknowledge that they never considered alternatives, including a shorter buffer zone.

only for drivers, but for pedestrians, including "way-finding" or "directional" signs, and "displays on the Downtown Mall," such as those "for the Festival of the Photograph," "the film festival," and "the book festival," which "can be observed" and "are quite graphic, large and attractive."   Ms. Alexander acknowledged the danger of drivers being distracted by the directional signs, but stated that "hopefully" drivers would stop their cars to read the signs.  She stated that she supported the proposed buffer zones because "adding another distraction to that [area] seemed not to be a good idea."  When asked what kind of safety problem is created for either pedestrians or drivers of motor vehicles if a pedestrian, with her back turned to the vehicles, is being solicited twenty feet away from the intersecting street, Ms. Alexander replied, "That should not create a traffic safety problem."

Although the City's own police officers admit that a person who begs or panhandles on the Mall typically uses a handmade sign asking for donations and stays mostly in one location along the north or south side of Main Street, the City maintains that the fifty-foot no-solicitation zones are necessary for pedestrian safety.   According to City officials, the creation of the no-solicitation zones was prompted by "specific reports that those who are standing adjacent to the two cross streets are creating distractions for both pedestrians and drivers that have led to several near misses."  In the variations on that theme, I discern three separate rationales that the City has set forth in support of its limitation on the right to beg in the fifty-foot buffer zones.

First, the City recites concern that soliciting donations from the occupants of vehicles may distract drivers, who may stop for the solicitor and then fail to proceed with caution.  The City asserts that several city employees have seen drivers who were distracted by individuals standing adjacent to the intersecting streets and actively soliciting from the drivers.  In one such incident, a police office testified that a person with a "sign" approached a car that was crossing the Mall at

4th Street, the driver stopped, an "exchange" ensued, and then the driver proceeded, but had to brake to avoid hitting a pedestrian.[6]  Mr. Tolbert, the City's Director of Neighborhood Development Services, testified that he saw the near miss of a child by a driver who was "engaged with one of the people soliciting, and started their car up without looking."  Although Mr. Tolbert described "people soliciting" as "[h]olding their signs, soliciting," he did not testify that the supposed solicitor involved in the "near miss" with the child was seeking "an immediate donation of money or other thing of value."

Second, the City maintains that the mere presence of beggars within fifty feet poses a distraction that could cause a driver to strike a pedestrian.  The record discloses no incidents or anecdotes that City officials could cite to support this argument, although one police officer who was responsible for patrolling the Mall testified that he had noticed that some motorists, as they crossed over the Mall, were diverting eye contact from the street to individuals on the Mall.  The officer acknowledged that he did not know what the drivers may have been looking at, and admitted that the drivers "may have" been looking at him or at other things on the Mall. Furthermore, city officials acknowledge that there are many distractions on the Mall for both drivers and pedestrians.  There are detailed instructional signs at the 4th Street crossover.  The bank immediately adjacent to the 4th street intersection sometimes hosts a table on the Mall in front of its branch.  There are large displays promoting the City's various fairs and festivals. There are sandwich boards within the fifty-foot buffer zones that solicit the sale of goods and services.  Yet, although City officials acknowledge that the sale of goods within the fifty-foot

---

[6] As discussed further herein, by stopping the vehicle in 4th Street, the driver violated Charlottesville City Code § 15-51, and by failing to yield the right-of-way to the pedestrian, the driver violated City Code § 15-75, yet the officer said nothing to the driver of the vehicle.

buffer zones creates the same problem as seeking "an immediate donation of money or other thing of value," and admit that vendors within the fifty-foot buffer zones are in violation of the ordinance's prohibition against soliciting "the sale of goods or services" within the fifty-foot buffer zones, the City nevertheless permits and licenses several vendors whose tables are set up within the buffer zone.

Third, the City contends that, in an effort to avoid panhandlers, pedestrians may take extreme diversionary steps that lead them into the intersecting street—from as far as fifty feet away. This rationale is not supported by any evidence, anecdotal or otherwise, and City officials admitted that they had heard of no reports of problems created by soliciting as far away as fifty feet from the intersecting streets.

*C.*

When a regulation is content-neutral, it must be narrowly tailored to serve a significant government interest. *Ward*, 491 U.S. at 791; *Clark v. Committee for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983). When a regulation is content-based, as it is here, it is presumptively unconstitutional and the government must show that the restriction is the least restrictive means to further a compelling governmental interest. *See United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000).

Under either level of scrutiny, the government has the burden of justifying the limitation on First Amendment rights. "When the government defends a regulation of speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Psinet, Inc. v. Chapman*, 362 F.3d 227, 238 (4th Cir. 2004) (quoting *Turner*, 512 U.S. at 664). "*It must demonstrate that the recited harms are real, not*

merely conjectural, **and that the regulation will in fact alleviate these harms** in a direct and material way." *Turner*, 512 U.S. at 664 (emphases added); *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *Perry*, 460 U.S. at 45.  Likewise under either level of scrutiny, if the government adequately demonstrates that there is a serious problem justifying regulation, "the Government still bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner*, 512 U.S. at 665 (quoting *Ward*, 491 U.S. at 799). The government's burdens are not satisfied by mere recitation, for the court has an "obligation to exercise independent judgment" when reviewing the government's justification for a regulation on speech.  *Id*. at 666.

In this case, as the Court of Appeals found, the ordinance "plainly distinguishes between types of solicitations on its face," *Clatterbuck*, 708 F.3d at 556, and thus the question that remains is whether the City has presented a content-neutral justification for those distinctions, *i.e.*, "a reasonable fit between the content distinction made in the Ordinance—singling out requests for *immediate* donations—and the City's justification for that distinction," *id*. at 559 (citations omitted).  The inquiry now is "why—not whether—the [City] has distinguished content in its regulation." *Brown*, 706 F.3d at 301.

Here, the City fails to justify the distinctions it drew in the ordinance.  For example, the concern about drivers of motor vehicles who may proceed without appropriate caution after stopping (or having been attempted to stop) has nothing to do with the *reason* for stopping the vehicle.  The same public safety issue is presented whether the person stopping (or attempting to stop) the vehicle is seeking an immediate donation of something of value; or a signature on a petition; or a pledge of future donations; or directional information; or a handoff from the driver of something the pedestrian forgot, *e.g.*, cash for movie tickets; or dropping off a passenger at

the movie theater—which, according to the chief of police, was the main reason for opening 2nd Street to vehicles in the first place; or any variety of other reasons.

Indeed, the Virginia legislature has specifically provided that "any county, city, or town . . . is . . . authorized to adopt an ordinance prohibiting or regulating," *inter alia*, the "solicitation of contributions of any nature from the occupants of motor vehicles on highways located within [the locality's] boundaries or on public roadways and medians" and the "distribution of handbills . . . or similar materials to the occupants of motor vehicles on highways located within its boundaries or on public roadways or medians." Va. Code § 46.2-931(A)(2) & (1). Nonetheless, the City enacted an ordinance limiting its prohibition to "any person" who solicits "money or other things of value" or "the sale of goods or services . . . [o]n the Downtown Mall within fifty (50) feet (in any direction) of 2nd Street West and 4th Street East, when those streets are open to vehicular traffic," although all solicitations from or exhibitions of signs or distributions of flyers to the drivers and occupants of motor vehicles present the same public safety issue.

My examination of the record reflects that the City's focus was on panhandlers, and the City created an ordinance reflecting that focus, rather than "a reasonable fit between the content distinction made in the Ordinance . . . and the City's justification for that distinction." *Id.* at 559 (citations omitted).

The single concrete example provided by the City, where a police officer observed someone stop a vehicle and "exchange" something with the driver, illuminates this point, given that the officer did not know what was "exchanged," and therefore did not know whether the ordinance was violated. Regardless of the reason the vehicle was stopped or what was exchanged—"money or other things of value," or not?—the situation presents the City's claimed

-15-

public safety issue.  The ordinance leaves unregulated a broad array of behavior that, in terms of a potential threat to pedestrian safety from motor vehicles, is indistinguishable from soliciting "an immediate donation of money or other thing of value."  Prohibited activity is distinguished from similar non-prohibited activity only in terms of the particular message conveyed.  This distinction demonstrates not only the lack of "a reasonable fit between the content distinction made in the Ordinance . . . and the City's justification for that distinction," *id*. at 559 (citations omitted), but it also highlights the City's intention to discriminate against a particular type of speech (panhandling) and a particular kind of speaker (beggars).

Although the City claims that its ordinance was adopted principally to deal with the problem of solicitors distracting drivers, and thereby endangering pedestrians, the City admits that it nonetheless permits considerable conduct in the fifty-foot zones that creates that same problem.  This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Assn*, 564 U.S. ___, ___, 131 S. Ct. 2729, 2740 (2011) (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 51, (1994); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989)).  The City's safety officials claim that the principal concern for pedestrian safety on the Mall is distracted drivers at the "point of conflict" where cars and pedestrians come into close proximity, but the ordinance allows people to engage in a variety of activities in the fifty-foot buffer zone that can and do distract drivers.

According to the City's safety officials, the greatest danger is that of stopping a car whose driver may then proceed without appropriate caution.  However, that danger exists regardless of the reason the car is stopped.  Indeed, the record reflects that cars often stop in the middle of 2nd Street to drop passengers at the Regal Movie Theater, and that the primary reason 2nd Street was

opened to vehicular traffic was *specifically so that cars could stop in the middle of 2nd Street to drop passengers at the Regal Movie Theater*.  There is noting about a request for "an immediate donation of money or other thing of value" that creates a greater danger than any other reason a motor vehicle may stop in the streets intersecting the Mall, or any other distraction in the fifty-foot buffer zone, such as the sandwich boards and vendor tables soliciting the "the sale of goods or services" in plain violation of the ordinance.[7]  "Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling."  *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 546-47 (1993).  By allowing the sandwich boards and vendor tables soliciting the "the sale of goods or services" in the fifty-foot buffer zones, "the city necessarily has conceded that some communicative interests, *e.g.*, onsite commercial advertising, are stronger than its competing interests in . . . traffic safety."  *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 520 (1981).

---

[7] In *Brown v. Entertainment Merchants Assn*, 564 U.S. ___, 131 S. Ct. 2729 (2011), the Supreme Court of the United States held unconstitutional a California law that restricted the sale or rental of violent video games to minors.  The Court observed that, "[b]ecause the Act imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest."  *Id.*, 564 U.S. at ___, 131 S. Ct. at 2738 (citing *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992)).  Because the state presented only "ambiguous proof," which did "not suffice" "to show a connection between exposure to violent video games and harmful effects on children," it could not meet that standard.  *Id.*, 564 U.S. at ___, 131 S. Ct. at 2739.  The Court observed that,

> [o]f course, California has (wisely) declined to restrict Saturday morning cartoons, the sale of games rated for young children, or the distribution of pictures of guns.  The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, *which in our view is alone enough to defeat it.*

*Id.*, 564 U.S. at ___, 131 S. Ct. at 2740 (emphasis added).

*D.*

The City has failed to show that the restriction is the least restrictive means to further a compelling governmental interest.  *See Playboy*, 529 U.S. at 813.  Moreover, the record discloses that the fifty-foot buffer zone is not narrowly tailored to serve a significant government interest.  *See Ward*, 491 U.S. at 791.  The "essence of narrow tailoring" is that the regulation must "focus[] on the source of the evils the city seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils."  *Ward*, 491 U.S. at 799 n. 7.  "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schulz*, 487 U.S. 474, 485 (1988); *see also Columbia Union Coll. v. Clarke*, 159 F.3d 151, 157 n. 2 (4th Cir. 1988).  The burden of proof is on the City to demonstrate that its restrictions on speech are narrowly tailored.  *See Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989) ("What our decisions require is a 'fit' between the legislature's end and the means chosen to accomplish those ends. . . .  Moreover, since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.").

The City's legitimate interest is to prevent conduct that presents a public safety hazard at the "point of conflict" between cars and people, but the fifty-foot buffer zone created by the ordinance "burdens substantially more speech than is necessary to further the government's legitimate interests."  *Turner*, 512 U.S. at 665.  As I have previously mentioned, the record reflects that panhandlers (including Plaintiffs) typically sit holding signs seeking contributions in a fixed location along the sides of Main Street.  The examples cited by City officials of individuals soliciting directly from cars are rare occurrences, and in none of those examples was there any evidence that the solicitor was requesting "an immediate donation of money or other

thing of value."  The City's traffic engineer and police chief both testified that there is no public safety issue if, within the fifty-foot buffer zone, a panhandler with a sign faces away from the street or faces in the same direction as the vehicles are proceeding on the one-way intersecting street.

The ordinance criminalizes a significant amount of protected speech that poses no demonstrable threat to pedestrian safety, yet permits a variety of forms of solicitation.  Indeed, the fifty-foot buffer zone is so underinclusive that, in the examples cited by the City of drivers being stopped by supposed "solicitors," there is no evidence that the purported solicitation was of the very specific type prohibited by the ordinance.  The City claims to be concerned about solicitors stopping vehicles, but it has prohibited only a very specific form of solicitation, and regarding its claim that drivers have been distracted by the presence of solicitors holding signs, one cannot conclude from the reported example that the solicitor was violating the ordinance without knowing what the sign said.  If drivers are, in fact, distracted by people holding signs, prohibiting only signs that request an immediate donation will not eliminate the safety issue of drivers being distracted by people with signs.

Significantly, and completely aside from the distinction of "an immediate donation of money or other thing of value" from other solicitations, the record discloses no explanation of how or why the measurement of fifty feet was chosen for the no-solicitation buffer zones, and no public safety justification (or any other justification) is offered for that measurement (or lack thereof, as the record also discloses that the margins of the fifty-foot zones are indeterminate, as there is no agreement among City officials regarding where the measurement begins).  City officials admit that no other alternatives were considered when the City adopted the zones, yet there are a number of approaches that would address the claimed public safety issue without

-19-

burdening speech, and the existence of these approaches "highlights the animating First Amendment principle that government must consider pursuing its interests through conduct-based regulations before enacting speech-based regulations." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827 (9th Cir. 2013).

The City has various traffic regulations in place that directly address the City's claimed public safety concerns and place no imposition on First Amendment speech rights. City Code § 15-151 prohibits any person from allowing a vehicle to park or stand upon a street crossing. Section 15-75 requires drivers to yield the right-of-way to a pedestrian crossing a street. The Code of Virginia also provides regulations that address the claimed public safety concerns. Virginia Code § 46.2-888 prohibits stopping a vehicle "in such a manner as to impede or render dangerous the use of the highway by others." Section 46.2-818 prohibits stopping the vehicle of another for the purpose of impeding its progress. Section 46.2-924 prohibits pedestrians from entering or crossing an intersection in disregard of approaching traffic, and requires drivers to yield the right-of-way to pedestrians at crosswalks. The City could also adopt the broad prohibitions allowed by state statute, which are focused on the claimed problem of driver distraction.

Of course, as offered by the chief of police, the "point of conflict" between cars and pedestrians could be resolved by closing the intersecting streets to vehicular traffic, as they had been previously for twenty years.

Concerns about the actual conduct of panhandlers interfering with the right of a pedestrian to move freely about the Mall are addressed by the City's prohibition on aggressive panhandling. Sections 28-31(a)(1) and (b)(1-5) of the Charlottesville City Code prohibit solicitors from, *inter alia*, the following:

- making physical contact;

- approaching or following the person being solicited if likely to cause a reasonable person to fear harm or reasonably likely to intimidate the person being solicited;

- continuing to solicit after a negative response (if reasonably likely to have the same effect);

- intentionally or recklessly blocking the safe or free passage of the person being solicited or requiring the person to take evasive action to avoid physical contact;

- or using language or gestures likely to cause a reasonably person fear harm or to feel intimidated into giving a donation.

These provisions address conduct by panhandlers that might cause a pedestrian passer-by to take evasive actions that might put the pedestrian in danger, even from less than fifty feet from the intersecting streets.  "[I]f there are numerous and obvious less burdensome alternatives to the restriction on . . . speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable."  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13 (1993).[8]   Indeed, the existing laws I have discussed are obvious alternatives that directly address the issue of pedestrian safety, yet have little-to-no impact on free speech.

---

[8] *See also Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637 (1980) ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation.  Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949-950 (9th Cir. 2011) (en banc) (holding that ordinance that prohibited soliciting from an occupant of motor vehicle was not narrowly tailored, in part, because city could achieve its interests by enforcing existing traffic laws); *Casey v. City of Newport, R.I.*, 308 F.3d 106, 120 (1st Cir. 2002) (considering a ban on amplification, the court found that the city had failed to carry its burden to establish narrow tailoring where "the record was devoid of any explanation of why the alternative of enforcing the City's noise ordinance . . . would not have achieved the City's objective as effectively as the amplification ban, while placing a substantially lesser burden on speech").

*E.*

In sum, Charlottesville City Code § 28–31(a)(9) prohibits protected speech, and the City has failed to show that the prohibited speech necessarily creates the safety issue that the City claims, yet § 28–31(a)(9) permits conduct and speech that the record shows does, in face, create the claimed safety issue. There are other laws that permit the City to protect the public safety without burdening speech rights, and the City offers insufficient justification (much less a good explanation) for the fifty-foot measurement of the so-called buffer zone. Section 28-31(a)(9) fails to survive strict or intermediate scrutiny, and therefore it must be declared unconstitutional because it violates the First Amendment of the United States Constitution, and the City of Charlottesville, Virginia must be enjoined from enforcing subsection (a)(9) of the ordinance.

**IV.**

Before concluding, I will briefly discuss *McCullen v. Coakley*, 573 U.S. ___, 134 S. Ct. 2518 (2014), regarding which the parties sought and were granted leave to file supplemental briefs. The reasoning in *McCullen* underscores the unconstitutionality of § 28-31(a)(9).

In *McCullen*, the Supreme Court of the United States unanimously invalidated a statute that prohibited demonstrators and sidewalk counselors from coming within thirty-five feet of the entrance to an abortion clinic. The Court found the statute at issue in *McCullen* to be content-neutral, but it emphasized that it

> would not be content neutral if it were concerned with undesirable effects that arise from "the direct impact of speech on its audience" or "[l]isteners' reactions to speech." If, for example, the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech. *All of the problems identified by the Commonwealth here, however, arise irrespective of any listener's reactions.*

-22-

*McCullen*, 573 U.S. at ___, 134 S. Ct. at 2531-32 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)) (emphasis added).

In the instant case, one of the rationales the City cites to justify the fifty-foot buffer zones is precisely because of listeners' supposed reactions to beggars—specifically, that pedestrians made uncomfortable by beggars will take "evasive maneuvers" to avoid them, and might thereby flee into traffic. This rationale is not content-neutral, given that it is based on an imagined listener's expected reaction. The content-based nature of the ordinance is even clearer when one considers the many forms of communication that are not prohibited by the ordinance, but which a reasonable pedestrian fervently may wish to avoid, such as obnoxious wolf-whistles and catcalls, earnest political entreaties, and the like.

As I have already discussed, § 28-31(a)(9) is content-based. Therefore, the ordinance "must satisfy strict scrutiny—that is, it must be the least restrictive means of achieving a compelling state interest." *Id.*, 573 U.S. at ___, 134 S. Ct. at 2530 (citing *Playboy*, 529 U.S. at 813). However, even if an ordinance regulating speech is deemed content-neutral, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*, 573 U.S. at ___, 134 S. Ct. at 2535 (citing *Ward*, 491 U.S. at 799).

In *McCullen*, for example, a Massachusetts official had testified that "fixed buffer zones would 'make our job so much easier.'" *Id.*, 573 U.S. at ___, 134 S. Ct. at 2540 (appendix citation omitted). As the Supreme Court reasoned,

> [o]f course they would. But that is not enough to satisfy the First Amendment. To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.

*Id*.

Here (again, as previously discussed), the City does not explain why its public safety concerns regarding panhandlers cannot be addressed by less restrictive means.  The City has shown no effort to enforce existing traffic regulations against drivers who cause safety hazards when interacting with purported solicitors.  To the extent the City claims that the danger arises from soliciting directly from drivers, it does not explain why or how an ordinance prohibiting only solicitation directly from drivers would be inadequate.  To the extent the City claims that drivers are distracted by beggars who are not soliciting directly from drivers but are merely active in vaguely measured zones on the margins of the cross-streets (a claim for which the City has presented no evidence), or that pedestrians might proceed into moving traffic in order to avoid beggars (a claim for which the City likewise has presented no evidence), the City has not explained why a fifty-foot buffer zone is necessary to accomplish those goals, particularly when there is no regulation of other conduct that could cause pedestrians to take "evasive action" or of conduct that the City admits could distract drivers.[9]

Given the City's burden of proof in this case—that is, that "the government must *demonstrate* that alternative measures that burden substantially less speech would fail to achieve the government's interests"—the ordinance fails to survive intermediate scrutiny, much less strict scrutiny.  *McCullen*, 573 U.S. at ___, 134 S. Ct. at 2540 (emphasis added).  The City essentially offers no good explanation at all for its fifty-foot buffer zones, and the record discloses none.

---

[9] In its attempt to explain the fifty-foot measurement, the City summarizes its traffic engineer's testimony that, "based on her experience as a traffic engineer and [her] personal observation, 50' was a reasonable distance.  She noted that 20' was not enough distance and that 100' was too much."

**V.**

For the reasons discussed herein, the City's motion for summary judgment will be denied,

Plaintiffs' motion for summary judgment will be granted, and Plaintiffs' request for relief will be

granted as set forth in the order accompanying this memorandum opinion.

**ENTERED**: February __19th__, 2015.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE